# Illinois Official Reports

## Appellate Court

---

### *People v. Whirl*, 2015 IL App (1st) 111483

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SHAWN WHIRL, Defendant-Appellant. |
| District & No. | First District, Third Division<br>Docket Nos. 1-11-1483, 1-14-0801 cons. |
| Filed | August 12, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 90-CR-12036; the Hon. Jorge Alonso, Judge, presiding. |
| Judgment | No. 1-11-1483, appeal dismissed.<br>No. 1-14-0801, reversed and remanded with directions. |
| Counsel on Appeal | People's Law Office (G. Flint Taylor, Jr., and Ben H. Elson, of counsel) and Exoneration Project (Jon Loevy, Russell Ainsworth, Tara Thompson, and David B. Owens, of counsel), both of Chicago, for appellant.<br><br>Stuart A. Nudelman, Andrew N. Levine, and Brian J. Stefanich, Special State's Attorneys, of Chicago, for the People. |
| Panel | JUSTICE MASON delivered the judgment of the court, with opinion.<br>Justices Lavin and Hyman concurred in the judgment and opinion. |

**OPINION**

¶ 1  Following the denial of a motion to suppress his confession, petitioner-appellant Shawn Whirl pled guilty to a murder and armed robbery committed on April 18, 1990, and was sentenced to 60 years in prison. Whirl's motion for leave to file a successive postconviction petition was denied on April 12, 2011. In 2012, the Illinois Torture Inquiry and Relief Commission issued a disposition on Whirl's claim that his confession was coerced, which led to the filing of a combined petition under the Post-Conviction Hearing Act (Postconviction Act) (725 ILCS 5/122-1 *et seq.* (West 2012)) and the Illinois Torture Inquiry and Relief Commission Act (Torture Inquiry Act) (775 ILCS 40/1 *et seq.* (West 2012)). Following an evidentiary hearing, Whirl's combined petition was denied. This consolidated appeal involves the denial of Whirl's motion for leave to file a successive postconviction petition (No. 1-11-1483) and the denial of his combined petition (No. 1-14-0801). Whirl contends that the trial court erred in denying the petition where it (1) based its decision on whether it personally believed Whirl was tortured, (2) disregarded the pattern of misconduct in which the detective who obtained Whirl's confession participated, (3) declined to give any weight to the fact that each detective who could have rebutted Whirl's allegations of torture asserted his fifth amendment privilege, and (4) concluded that the evidence did not constitute a *Brady* violation (*Brady v. Maryland*, 373 U.S. 83 (1963)). Finding merit to Whirl's arguments, we reverse and remand.

¶ 2             BACKGROUND

¶ 3       Initial Proceedings in the Trial Court

¶ 4  In the early morning hours of April 18, 1990, the body of 40-year-old Billy Williams, a taxicab driver, was found inside a cab in the parking lot of Gately Stadium on the south side of Chicago with a gunshot wound to the back of his head. The cab Williams had been driving at the time was dusted for fingerprints, and prints taken from the passenger door were identified as belonging to Whirl. Detectives attempted to locate Whirl at his mother's address but were unsuccessful.

¶ 5  The police were able to locate Whirl on April 20, 1990, and he was arrested and taken to Area 2 for questioning.[1] Following an interrogation by Detectives James Pienta and William Marley, Whirl confessed to Williams' murder. Whirl was charged with murder and attempted armed robbery.

¶ 6  At the hearing on Whirl's motion to suppress his confession, Whirl testified that he was taken to Area 2 at 12 p.m. on April 20 and handcuffed by one hand to the wall of an interview room. He was first interviewed by Detectives John Duffy and James Dwyer. He answered their questions about his whereabouts over the previous two days and denied any involvement in the murder. Whirl estimated the duration of the interview as somewhere between 45 minutes and 2 hours. After Duffy and Dwyer left, Whirl was left by himself in the interview room with his hand still cuffed to the wall and he fell asleep.

---

[1]According to the police report, the detectives left a business card at Whirl's mother's house. When Whirl called the number on the card on April 20 to find out why the police were looking for him, he was told to call back at 12:30 p.m. When Whirl called back, the police traced the call and arrested Whirl while he was still on the phone.

¶ 7    Several hours later, Detective Pienta entered the room, stepped on Whirl's foot, said "wake up nigger" and slapped him in the face. Pienta handcuffed both of Whirl's hands to the wall and told him the statement he gave to the other detectives "won't do." Pienta told Whirl that if Whirl cooperated with him, Pienta would get him something to eat and would let Whirl see his girlfriend and go home. However, if Whirl did not cooperate, Pienta said that they would put his girlfriend in the interview room instead. Pienta instructed Whirl to repeat after him and there would be no problem.

¶ 8    Pienta then began telling Whirl things to say in his statement about how the murder was committed. When Whirl would not agree to the things Pienta was saying, Pienta slapped him. As Whirl continued to deny any involvement in the murder, Pienta continued to slap him. Whirl had his leg up on the bench and Pienta asked him about a wound he noticed on Whirl's leg. Whirl told him it was from a fight he had been in a few days earlier, during which he fell off an elevated train platform and scraped his leg.

¶ 9    Whirl continued to get the statement wrong, and Pienta started to get angry. Pienta told Whirl to put his leg down on the floor. Pienta then stepped on Whirl's foot and scraped the wound on his leg with a key Pienta had removed from a set of keys he was carrying. Whirl yelled in pain after Pienta scraped his wound, and Pienta told him to shut up. Pienta continued to tell Whirl what to say and scrape his injury with the key. Eventually, Whirl started to repeat the statement back but could not remember all of the details. When Whirl would make mistakes in repeating the statement back, Pienta would slap him and scrape his wound with the key again. Every time Pienta scraped his wound, Whirl would yell in pain and tell him to stop.

¶ 10    Sometime after Pienta left the room, an assistant State's Attorney came in and asked Whirl how he had been treated. Whirl told him he had been treated fine and the assistant State's Attorney left. Pienta returned to the room and had Whirl go over the statement again. Pienta then took Whirl to see his girlfriend, Tanya. Whirl was not allowed to speak to Tanya and could only see her through a glass partition, but Tanya could not see him.

¶ 11    Whirl remained in the room where they had taken him to see Tanya. Pienta, another officer, the assistant State's Attorney and a court reporter were also in the room. Whirl gave the statement Pienta had previously told him to give. The assistant State's Attorney had Whirl read the statement the court reporter typed and asked him if it was correct. Whirl said yes and the assistant State's Attorney asked him to initial the statement.

¶ 12    Erma Whirl, Whirl's mother, testified that the day before Whirl's arrest, she asked him what was wrong with his leg. Whirl did not want her to see it, but Erma lifted his pant leg and looked anyway. There was a sore on Whirl's leg but it was not bleeding. When shown the picture of Whirl's wound that was taken after his arrest, Erma said that the sore in the photograph looked wider than the sore she had seen and had a scab or something on it, which had not been there when she looked at it.

¶ 13    Tanya Crawford testified that she had been in a relationship with Whirl for two years at the time of his arrest. On April 20, 1990, some police officers came to her home around 4 p.m. and took her to the police station for questioning. Crawford was taken to an interview room and remained there until 1 a.m. After she had been in the room for a while, Crawford heard Whirl "hollering." She could not hear Whirl saying anything but heard a loud "aaah" sound and she recognized the voice as Whirl's voice. Crawford heard the sound repeated a number of times.

¶ 14    Renayldo Howard, a sergeant in the United States Army and Whirl's brother, testified that he received a call from another brother that Whirl was in jail and went to the police station around 3 a.m. on April 21. Howard was allowed to visit Whirl and talked to him in a visiting area. They sat in cubicles where they were separated by a partition that had glass from about waist level up. Howard noticed Whirl was not wearing a belt or shoelaces and asked him why. Whirl put his leg out and said the shoelaces were taken away "because we might strangle ourselves." Howard then noticed a raw sore on one of Whirl's legs.

¶ 15    Howard was shown a photograph that was taken some time after Whirl's interrogation. Howard explained the sore he saw the night of Whirl's arrest looked different than the sore in the photo because the photo showed a scab on the sore but when Howard saw it, the sore was raw and just starting to clot.

¶ 16    The trial court would not allow Howard to testify, on hearsay grounds, regarding what Whirl told him when Howard asked how he had gotten the sore on his leg. However, the trial court did accept an offer of proof made by Whirl's attorney, who informed the court that if Howard was allowed to testify as to Whirl's response, he would state that Whirl told him the police "did things" to him.

¶ 17    Detective John Duffy testified that he and his partner interviewed Whirl at approximately 2 p.m. on April 20. Whirl was not handcuffed during the interview, but was handcuffed when he was left alone in the interview room. Whirl told Duffy about an injury on his left leg, then pulled his pant leg up and showed the injury to Duffy. The injury was not bleeding at that time but was in the process of healing and was scabbed over.

¶ 18    Pienta testified that he and his partner, Marley, first interviewed Whirl around 6:30 p.m. on April 20. Pienta read Whirl his *Miranda* rights (see *Miranda v. Arizona*, 384 U.S. 436 (1966)) and Whirl stated that he wanted to waive his rights and talk to them. The interview lasted for 30 to 45 minutes and Marley was present for the entire interview. Pienta denied scraping Whirl's leg with a key or threatening Whirl in any way. He further stated that Whirl was not handcuffed to the wall at any time during the interview.

¶ 19    Near the end of the interview, Whirl mentioned a leg injury. Pienta could not remember why the injury was mentioned but saw it briefly and described it as a large, "older injury" that was scabbed over. Whirl told Pienta he sustained the injury during an incident with "gang bangers" on an "el" platform that occurred "a couple years prior" to his arrest. However, on cross-examination Pienta stated Whirl told him the injury had occurred two or three weeks prior to his arrest. After refreshing his recollection with the notes he took during the interview, Pienta conceded that the injury occurred two or three days prior to Whirl's arrest. Pienta maintained that the injury was scabbed over and healing when he interviewed Whirl.

¶ 20    Richard Stevens, an assistant State's Attorney, testified that he first spoke with Whirl around 9 p.m. on April 20. Pienta and Marley were both in the interview room and Whirl was not handcuffed to the wall. Stevens advised Whirl that he was an attorney who worked with the police, read Whirl his *Miranda* rights, and asked if Whirl would be willing to speak with him. Whirl gave a 20 minute oral statement and Stevens then asked the detectives to leave the room. After they left, Stevens asked Whirl how he had been treated and Whirl said he had been treated fine. Whirl agreed to repeat his statement in front of a court reporter. At 11 p.m., a court reporter transcribed Whirl's statement. Stevens, Pienta and Marley were also in the

room, but Stevens conducted the questioning and the detectives did not speak during the statement. Whirl read the typed statement and signed it.

¶ 21 According to the statement, Whirl had been visiting a friend in Harvey, Illinois. Whirl left his friend's house and walked to a bus terminal. Whirl stated that he was planning to rob a cab. When asked why, Whirl responded, "For one thing, I didn't have any rent money." Whirl said that he had a .45 automatic that he had gotten "off the street" for $40 or $45. Whirl took the bus to 95th Street and the Dan Ryan Expressway and from there took the "el" to 87th and the Dan Ryan. He went to a store called Ames and bought some items for his fiancée.

¶ 22 When Whirl returned to the "el" stop at 87th and the Dan Ryan, he saw three gang members. Whirl was wearing a starter hat and the gang members were talking about taking his hat. One of them approached him and asked if the jacket went with the hat. Then another gang member hit him in the face and knocked him off the platform. As Whirl fell, he scraped his leg. Whirl grabbed one of the gang members by the foot and knocked him down. Whirl then jumped up and ran to get on the train. The gang members also got on the train and Whirl ran to the front of the train. When Whirl got off the train at 95th and the Dan Ryan, he saw the gang members behind him so he ran over to a gas station where he saw a cab and asked the cab driver to take him to 102nd and Forest.

¶ 23 Whirl sat behind the driver in the cab, but when they reached 102nd and Forest, Whirl asked the cab driver to take him to Gately Stadium because he had an interview there. During the cab ride, Whirl told the cab driver about some problems he was having and asked the driver how his day was going and had he made any money. When the driver stopped the cab at Gately Stadium, Whirl said, "I am sorry, sir, this is a stickup" and put the gun to the driver's head. Whirl asked the driver to give him the change that was in a pouch on the dashboard of the cab. The driver adjusted the rearview mirror and looked at Whirl but did not give him the change. Whirl said, "I was thinking about running and leaving it alone because I couldn't do it after telling him my problems and listening to him." Whirl lowered the gun, but when the cab driver turned around and his elbow touched the gun, Whirl raised the gun and shot him in the head.

¶ 24 After the gun went off, it fell to the floor. The cab was moving so Whirl reached up and put the car in park. The car kept going and hit a yellow divider in the parking lot before it stopped. Whirl got the Ames bag from the backseat, found the gun and picked it up, then opened the cab door and ran. Whirl ran into the middle of a park, dropped to his knees, started crying and threw the gun. Then he ran from the area and was arrested two days later.

¶ 25 Whirl was asked how he had been treated by the police and he responded, "Okay." He confirmed that he was allowed to use the washroom and that he was given some potato chips and a drink.

¶ 26 The parties stipulated that if Dr. Banerjee, a doctor who worked at Cermak Health Services at the Cook County jail, was called to testify, he would testify that on April 25, 1990, he prescribed a dressing for a wound on Whirl's left leg.

¶ 27 The trial court denied the motion to suppress, finding that the testimony, taken as a whole, did not indicate that Pienta coerced Whirl or inflicted any injury on him. The court noted that Whirl told the assistant State's Attorney that he had been treated well and did not tell anyone at the jail about the leg injury.

¶ 28    After the motion to suppress was denied, Whirl's counsel requested a Rule 402 (Ill. S. Ct. R. 402 (eff. Feb. 1, 1981)) conference to enter a guilty plea and noted that if the case went to trial, the State would be seeking the death penalty. The trial court informed the parties that if Whirl was found guilty, the court would most likely sentence him to a minimum of 60 years.

¶ 29    Following the State's summary of the evidence, defense counsel asked the trial court to consider that the statement indicated that Whirl intended to rob the cab driver and held a gun to his head, but then hesitated because prior to the attempted robbery, he and the cab driver had been having a conversation and he did not want to follow through with the robbery. It was only when the cab driver made a sudden movement that Whirl fired the gun. The trial court stated that its suggestion was still 60 years and defense counsel asked for a recess to confer with Whirl.

¶ 30    When the conference resumed, defense counsel asked if the court would consider 50 years instead, but the court did not change its position. After another recess to confer with Whirl, defense counsel withdrew the plea of not guilty and entered a plea of guilty. After the trial court determined that Whirl understood the charges and the sentences that could be imposed, ascertained that Whirl pled guilty voluntarily, and sentenced him to 60 years, defense counsel informed the court that Whirl wanted to address the court.

¶ 31    Whirl stated: "The thing I have to say is for the reason I'm taking this plea is for the simple fact that I didn't do it. I have to say I didn't do it." When the court asked, "You didn't do it?" Whirl repeated his denial. When the trial court asked why Whirl was entering a plea of guilty, Whirl started to explain that it was because if he lost the case he could get the death penalty, but the trial judge interrupted and said he would not accept a guilty plea and would not sentence Whirl to 60 years if Whirl denied committing the offense.

¶ 32    Defense counsel informed the trial court that he thought Whirl perhaps did not have full confidence in his attorney. The trial judge stated that he had never encountered a situation where a defendant pled guilty, was sentenced and then immediately proclaimed his innocence. The court indicated its intention to select a jury that afternoon and proceed to trial.

¶ 33    After another recess, Whirl informed the court that the reason he said he did not commit the offense is because he had never been to the penitentiary before and was afraid of doing the time, but he wanted to reinstate his guilty plea. The trial court questioned Whirl again regarding the voluntariness of his plea and resentenced him to 60 years in prison.

¶ 34                              Postconviction Proceedings

¶ 35    Whirl did not file a direct appeal or seek to withdraw his guilty plea. Whirl's initial postconviction petition filed in August 2008, claiming that he was never admonished regarding the three years of mandatory supervised release, was summarily dismissed at the first stage as frivolous and patently without merit. This court affirmed that dismissal. *People v. Whirl*, No. 1-09-0791 (2010) (unpublished order under Supreme Court Rule 23).

¶ 36    In 2011, Whirl sought leave to file a successive postconviction petition in which he claimed (1) ineffective assistance of counsel for failure to interview witnesses and obtain internal records regarding his torture claim and (2) actual innocence. In support of his actual innocence claim, Whirl attached Office of Professional Standards (OPS) records for Pienta, an affidavit from the attorney for Aaron Patterson detailing a systematic pattern of abuse by

Pienta, the transcript from the sentencing hearing, and an affidavit from Alexis Ballard.[2] Whirl did not attach the transcript from the suppression hearing because he had been unable to obtain it.

¶ 37 Ballard averred that he was waiting for a bus on 95th Street in April of 1990 when he witnessed Whirl being chased by Tommie Thompson. Ballard saw Whirl get into a cab. The cab returned a short time later and Thompson and one of his friends got into the cab. Ballard ran into Thompson later in the neighborhood and Thompson told him that he and his friends robbed and killed the cab driver who had driven Whirl away. Because the driver had driven Whirl off while Thompson and his friends were trying to "stick Whirl up," Thompson said he took it out on the driver once the driver returned to 95th Street. Ballard acknowledged that he did not witness the shooting and explained that he really did not want to get involved because Thompson was his friend. However, "[i]t is a known fact that Tommie commited [*sic*] the murder on the cab driver just about every body in the 100's and neighborhood knew of this."

¶ 38 In denying Whirl's motion for leave to file the petition on April 12, 2011, the trial court found that Whirl had not demonstrated the requisite cause and prejudice for his ineffective assistance claim. In reaching this determination, the trial court stated that it had reviewed all of the documentation submitted but "it appears as though this is the first time petitioner is alleging that certain Chicago Police Detectives tortured and abused him. Petitioner offers this court no evidence to indicate that he made this claim prior to or at the time of trial." In explaining its finding on Whirl's actual innocence claim, the trial court again stated that Whirl was raising the allegation that he was tortured and coerced into making an inculpatory statement for the first time in his postconviction petition. The trial court concluded that "[b]ecause petitioner has not *consistently* claimed that he was tortured into making a confession, this actual innocence claim must fail." (Emphasis in original.) The trial court also found that Ballard was not a competent witness because he did not witness the shooting.

¶ 39 Whirl appealed the denial of his motion for leave to file a successive postconviction petition on May 11, 2011, and this court docketed the appeal under case No. 1-11-1483. On May 25, 2012, this court granted Whirl's motion to stay his appeal.

¶ 40 Whirl filed a second *pro se* motion for leave to file a successive postconviction petition on January 12, 2012. In an affidavit attached to the petition, Whirl attested that he did not have his 1991 suppression hearing transcript at the time of filing his first successive postconviction petition. The transcript of the hearing would have provided the trial court with evidence that Whirl did, in fact, previously claim that he was tortured and his confession was coerced.

¶ 41 In his second successive postconviction petition, Whirl contended he received ineffective assistance of counsel, asserting that counsel (1) advised Whirl to plead guilty because the State was seeking the death penalty, and (2) failed to call witnesses who would have corroborated his initial statement that he was not involved in the murder. Two individuals would have verified Whirl was dropped off at 102nd Street and Forest Avenue, where one of those individuals treated the injury Whirl sustained when he scraped his leg on the "el" platform. In addition, two cab drivers told the police they saw the victim picking up another

---

[2]The trial court referred to this individual as "she" and "Ms. Ballard" but in a successive postconviction petition, Whirl refers to this individual as "he."

- 7 -

"fare" (described by one witness as two black males) at 95th Street and State Street after Whirl had been dropped off at 102nd and Forest.

¶ 42    Whirl attached copies of the police report to his petition. Willie Curtis, an investigator for the Cook County Public Defender's Office, told police he saw Williams picking up a fare in the vicinity of the Dan Ryan Rapid Transit Terminal between 9:45 and 10 p.m. on April 18. He could only see one person in the cab as it drove off, but was sure it was Williams because he was able to remember the cab number. Lee Kelsey, an independent cab driver, told police that he observed Williams picking up a white male passenger in the vicinity of the CTA Terminal around 9 p.m. on April 18. Williams returned to the terminal at approximately 10 p.m. and Kelsey observed two male blacks, between the ages of 20 and 30, average height, and wearing short jackets, get into the cab. Williams then drove east on 95th Street.

¶ 43    Whirl contended that these witnesses supported his initial statement to Duffy that he was dropped off at 102nd and Forest at approximately 9:30 p.m. The police report also confirms that Lavina Crawford, Tanya's mother, informed police that Whirl came to her house at 102nd and Forest in the "evening hours" of April 18 and went downstairs to see Fontaine McElrath, who lived in the basement. McElrath confirmed that Whirl had an injured leg on April 18. McElrath cleaned the wound on Whirl's leg. The statements of these individuals were also consistent with Whirl's initial statement to Duffy.

¶ 44    Whirl filed a motion for leave to amend his petition on February 7, 2012. Counsel from both People's Law Office and The Exoneration Project at the University of Chicago Law School later filed appearances on Whirl's behalf.

¶ 45    On June 13, 2012, the Illinois Torture Inquiry and Relief Commission (Commission), which is empowered by the Torture Inquiry Act (775 ILCS 40/1 *et seq*. (West 2012)) to formally inquire into the cases of individuals claiming their confessions were the product of police torture, issued a disposition in Whirl's case. The Commission found that "by a preponderance of the evidence, there is sufficient evidence of torture to conclude [Whirl's] Claim is credible and merits judicial review for appropriate relief."

¶ 46    The Commission noted that although Jon Burge had been reassigned to Area 3 at the time of Whirl's arrest, Whirl was questioned by Pienta, "a longtime Burge subordinate prior to Burge's reassignment." The Commission found that Whirl was repeatedly slapped and beaten by Pienta during questioning, and that when Whirl screamed, Pienta put a potato chip bag over his mouth so the screams could not be heard. The Commission further found that every time Whirl made a mistake in repeating the statement Pienta told him to give, Pienta would use a key to dig into a preexisting leg wound. The Commission noted that Howard, who the prosecution conceded was a credible witness, observed a raw sore on Whirl's leg shortly after his statement and the parties stipulated that a doctor treated Whirl's leg when he was processed into the jail.

¶ 47    The Commission also noted that Pienta, who had been working under Burge since the 1970s, had an extensive history of accusations of physical abuse and exercised his fifth amendment privilege against self-incrimination when questioned about physically abusing detainees. Moreover, without the confession, the State's case against Whirl was weak. There were no eyewitnesses, the murder weapon was never recovered, and the only forensic evidence was a fingerprint found on the front passenger door of the cab, which Whirl never mentioned touching in his statement. The Commission found that the statement contained internal anomalies and there were inconsistencies between the statement and other evidence

in the case. Notably, Whirl, who had no criminal record, was employed as a computer operator and was living at his mother's address so he had no need for rent money, the purported motive for the robbery according to the statement.

¶ 48    The Commission concluded that Whirl's claim qualified for summary referral for judicial review because (1) Whirl consistently claimed he had been tortured since his motion to suppress in 1991; (2) Whirl's claim was factually similar to other claims of torture contained in reports detailing investigations into Burge and police officers under his command; (3) Pienta, the accused officer, was identified in other cases alleging torture, including some strikingly similar to Whirl's claim; and (4) Whirl's claim was consistent with findings of systematic and methodical torture at Area 2 under Burge. In addition, the other available evidence set forth in the report indicated that the claim was credible and merited judicial review.

¶ 49    Following the Commission's disposition, on August 29, 2012, the trial court revisited its denial of leave to file a successive postconviction petition and granted Whirl's motion for leave to file the petition. On September 13, 2012, Whirl requested the appointment of a special prosecutor for his case. The motion was granted and, on May 7, 2013, Stuart Nudelman, a retired judge, was appointed as the special prosecutor in Whirl's case.

¶ 50    On May 9, 2013, counsel for Whirl filed a 52-page amended combined petition for relief pursuant to the Postconviction Act (725 ILCS 5/122-1 et seq. (West 2012)), section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2012)), and the Torture Inquiry Act (775 ILCS 40/1 et seq. (West 2012)). The torture allegations in the amended petition mirrored Whirl's testimony at the motion to suppress with one exception. The petition included the additional allegation that during the course of Pienta's abuse, Pienta "shoved a plastic potato chip bag against [Whirl's] mouth to muffle his screams." The petition detailed newly discovered evidence regarding the pattern and practice of coercing false confessions by Area 2 detectives, including Pienta, and alleged that the detectives continued the torture and abuse of suspects to obtain confessions after Burge left Area 2. The amended petition did not include the ineffective assistance and actual innocence claims from Whirl's pro se petition.

¶ 51    The State filed a motion to dismiss, in part, the section 2-1401 and Postconviction Act claims. The State conceded that the judicial review contemplated under the Torture Inquiry Act is akin to a third-stage evidentiary hearing under the Postconviction Act. But the State objected to the introduction of any evidence at such a hearing related to Burge or any other officer not alleged to have abused Whirl, and reserved its right to argue that the Commission exceeded its authority by recommending Whirl's case for judicial review because Pienta was not working under Burge at the time the alleged torture occurred.

¶ 52    On November 7, 2013, the trial court granted the motion to dismiss as to the section 2-1401 claims but denied it as to the postconviction claims, finding that Whirl was entitled to a third-stage evidentiary hearing. On January 13 and 14, 2014, a combined hearing was held pursuant to the Postconviction Act and the Torture Inquiry Act.

¶ 53    At the hearing, Whirl testified that he was arrested sometime between 12:30 and 1 p.m. on April 20, 1990, while he was making a telephone call from a pay phone to the police to find out why they were looking for him. Whirl's testimony regarding his treatment at Area 2, with certain exceptions we discuss below, was substantially similar to his testimony in 1990

at the hearing on his motion to suppress, *i.e.*, the initial interview by Duffy, the later interviews with Pienta and the taking of his statement.

¶ 54    Whirl's testimony regarding his initial interactions with Pienta was substantially the same as the testimony at his suppression hearing. Because Whirl provided additional details and explanations regarding the statement, we will recount his testimony on that issue in detail.

¶ 55    Whirl testified that Pienta began adding to the statement Whirl had originally given to Duffy. When Whirl told Pienta that was not what happened, Pienta slapped him. As Whirl continued to deny any involvement in the murder, Pienta continued to slap him in the same place on his left cheek. Whirl could not shield the blows because both of his hands were handcuffed, so he lifted his left leg up on the bench he was seated on. Pienta noticed an injury on Whirl's leg and asked him how he got it. Whirl explained to Pienta how some gang members tried to rob him and he scraped his leg when he fell off the "el" platform.

¶ 56    Pienta told Whirl to put his leg down on the floor. After Whirl complied, Pienta stepped on Whirl's foot, took a key out, and scraped the injury with the key in a downward motion. Because it was painful, Whirl said, "Aaah." Pienta said, "Shut up, nigger. You're going to cooperate. You're going to listen," and he continued scraping Whirl's injury with the key. Because it seemed as if the scraping intensified when he cried out in pain, Whirl thought that maybe if he tried to grit his teeth and stop yelling, Pienta would stop scraping his injury. After two more scrapes with the key when Whirl did not make a sound, Pienta asked, "Well, are you going to agree with me?" Whirl said yes because he could not take the pain any more. Whirl could not remember the total number of times his injury was scraped with the key but estimated that it was between 20 and 30 times.

¶ 57    Pienta continued to add details to Whirl's original confession, implicating Whirl in the murder, and repeatedly went over the statement with Whirl. When Whirl would forget certain things Pienta had told him to say, Pienta would slap him and scrape his leg injury with the key again. When Pienta was finally satisfied that Whirl had the statement correct, he left the room.

¶ 58    After the assistant State's Attorney came into the room, asked Whirl how he was doing, and left again, Pienta returned with a bag of potato chips and a can of pop. Pienta went over the statement with Whirl again, but when Whirl continued to confuse details in the statement, Pienta became frustrated and took the bag of chips and shoved it in Whirl's face in a disrespectful way.

¶ 59    Once Whirl finally got the statement right, Whirl was taken into another room where the assistant State's Attorney, another detective and a court reporter were waiting. As Whirl was giving his statement to the assistant State's Attorney, he would forget minor details. Pienta, who was sitting next to the assistant State's Attorney, would make hand gestures to remind Whirl of the statement details. Whirl gave the statement because he was afraid that if he did not, Pienta would slap him and scrape his injury with the key again. After Whirl gave his statement, he was taken downstairs and put in a cell.

¶ 60    A short time later, Whirl was taken to the visiting area to see Howard, his brother. He was limping as he walked into the room. Howard first asked why he did not have any shoelaces and then asked why Whirl was limping and told Whirl to show Howard his leg. Whirl told Howard the detective had taken a key and scraped his leg, and that they "beat the hell out of [him]."

¶ 61     After Whirl was taken to the Cook County jail, he told a nurse about the injury to his leg and she sent him to a doctor. The doctor examined the injury and instructed the nurse to wash it out with some brown ointment and put a dressing on it. Whirl's attorney subsequently visited him in jail with a photographer who took pictures of Whirl's injury. Whirl explained that at the time he was arrested, the injury was just a scrape but after he left the police station, the wound was about four inches long, deep, and filled with pus. The injury left a permanent scar.

¶ 62     Whirl explained that the reason he agreed to plead guilty is because after his motion to suppress the statement was denied, his attorney told him that his options were the death penalty or 60 years in prison and he chose the 60 years.

¶ 63     On cross-examination, Whirl was asked to explain the fight with the three gang members in detail. After describing the fight during which Whirl fell from the "el" platform down onto the tracks, scraping his leg on the way down, Whirl explained how he jumped back onto the platform, got on the train, and ran through the cars to get away from the three men he had been fighting. When the train got to 95th and State, Whirl exited the train, ran through the terminal, jumped over a divider, and hid behind a cab, looking for the men who were chasing him. The cab driver, who Whirl later learned was Williams, knocked on the window and gestured to Whirl. Whirl stood up and the men who had been chasing him saw him and came toward the cab. Williams drove Whirl to Tanya's mother's house at 102nd and Forest where Whirl went inside.

¶ 64     Whirl was then asked about his activities on April 19. Whirl and Tanya were watching TV and saw a news report about Williams being murdered the night before. After an initial denial, Whirl confirmed that in a petition for clemency he had prepared and sent to the governor in 2011, he stated that he said to Tanya, "I hope that the police don't try to pin that murder on me."

¶ 65     On redirect, Whirl explained that earlier that day he had been told by his mother and a janitor at their apartment building that the police were looking for him and had left a business card. Whirl did not understand why the police would be looking for him because the police had never come looking for him before. Whirl took the business card, intending to call the police later and find out why they were looking for him. When Whirl saw the news story about the cab driver's murder, because he had taken a cab the night before and was already wondering why the police would be looking for him, he made the connection and that is why he made the statement to Tanya that he hoped the police did not try to pin that murder on him.

¶ 66     Howard testified that at the time of the suppression hearing, he was in the military. He received a phone call from another brother sometime late in the day on April 20 and learned that Whirl had been arrested. Howard went to the jail to visit Whirl. When Whirl entered the visiting room, Howard noticed he did not have shoelaces and was not wearing a belt. The two of them joked about the shoelaces and when Whirl raised his leg in the air, Howard noticed an injury on Whirl's leg and asked him about it. The injury was approximately four inches long and was red and not scabbed over. Whirl told Howard that he had been chased by some "gangbangers" onto the "el" and scraped his leg when he slipped off the platform. Whirl also told Howard that the police had scraped his injury with a key.

¶ 67     Anthony Holmes and Mearon Diggins both testified that they were tortured by detectives at Area 2 until they confessed. Holmes was tortured in 1973 and Diggins in 1985. Holmes

was arrested by Pienta, Burge and several other officers and was suffocated and electrically shocked during his interrogation. The officers who arrested him were also present for the interrogation. Diggins identified Pienta as one of the detectives who arrested him and was present while he was being tortured but could not say for sure whether Pienta had ever beaten him during those two days or if he was just in the room while the beatings were taking place.

¶ 68    Pienta was called as a witness and asked whether he participated in the torture of Holmes, Diggins, Andrew Wilson, Terry Williams, Aaron Patterson, Eric Caine, James Hill, Terrence Houston, Darryl Cleveland, and, finally, Whirl. Pienta was also asked whether incidents of police brutality and torture continued after Burge left Area 2 in 1986. Pienta invoked his fifth amendment right to remain silent in response to all questions. The parties stipulated that if Marley, Burge, John Paladino, Raymond Madigan and William Pederson were called as witnesses, they would each invoke their fifth amendment rights.

¶ 69    The trial court was also provided with exhibits containing prior testimony of Whirl's mother, Crawford, Caine, Patterson, Houston, Dwyer, Duffy, Stevenson, and Detective Peter Dignan. Some of this testimony was presented at Whirl's suppression hearing while other witnesses testified in their own cases or as part of Burge's trial. The exhibits attached to Whirl's combined petition were also moved into evidence.

¶ 70    On February 13, 2014, Whirl's combined petition for relief pursuant to the Postconviction Act and the Torture Inquiry Act was denied. Although the trial court acknowledged that Whirl consistently claimed he was tortured, his claims were notably similar to other claims of torture, and Whirl's allegations were consistent with findings of systemic and methodical torture at Area 2 under Burge, the court found the allegations of other instances of torture at Area 2 were too remote. In addition, the trial court found that Whirl was not credible and was impeached on "many issues," including his statement that he could not read, his denial that he told Tanya he hoped the police would not try to "pin" the murder on him, his conflicting statements regarding the potato chip bag and whether Marley was in the room, and testimony regarding the wound itself. The trial court ultimately found that Whirl did not establish that he was abused or tortured by Pienta and, therefore, his remaining claims also failed. Whirl timely filed this appeal.

¶ 71                                    ANALYSIS

¶ 72    The Postconviction Act (725 ILCS 5/122-1 *et seq*. (West 2012)) provides a procedural mechanism by which any person imprisoned in the penitentiary may assert that there was a substantial denial of a federal or state constitutional right in the proceeding which resulted in his or her conviction. 725 ILCS 5/122-1(a) (West 2012); *People v. Harris*, 224 Ill. 2d 115, 124 (2007). A proceeding under the Postconviction Act is not a substitute for an appeal but rather a collateral attack on a final judgment. *People v. Edwards*, 2012 IL 111711, ¶ 21.

¶ 73    Postconviction proceedings consist of up to three stages. *People v. Pendleton*, 223 Ill. 2d 458, 471-72 (2006). At the first stage, the circuit court is required to dismiss petitions that are frivolous and patently without merit. *Harris*, 224 Ill. 2d at 126. A petition must present "the gist of a constitutional claim" to survive beyond the first stage. *Id.* At stage two, the circuit court may appoint counsel for the defendant and the State may move to dismiss the petition. *Id.*

¶ 74    At the second stage, the relevant inquiry is whether the petition establishes a substantial showing of a constitutional violation. *Id.* If the petition survives a motion to dismiss, it

proceeds to the third stage where the circuit court conducts an evidentiary hearing. *Id*. At both the second and third stages of postconviction proceedings, the defendant bears the burden of making a substantial showing of a constitutional violation. *Pendleton*, 223 Ill. 2d at 473. The circuit court does not engage in fact-finding or credibility determinations at the dismissal stage; rather, such determinations are made at the evidentiary stage. *People v. Coleman*, 183 Ill. 2d 366, 385 (1998).

¶ 75    The Postconviction Act contemplates the filing of only one postconviction petition; however, a successive petition is allowed where the petitioner demonstrates cause for the failure to bring the claim in the initial petition and prejudice resulting from that failure. 725 ILCS 5/122-1(f) (West 2012); *People v. Ortiz*, 235 Ill. 2d 319, 330 (2009). Moreover, where a petitioner sets forth a claim of actual innocence in a successive postconviction petition, the petitioner is excused from showing cause and prejudice. *Id*.

¶ 76    We will not reverse a trial court's denial of a postconviction petition following an evidentiary hearing where fact-finding and credibility determinations are made unless the court's findings are manifestly erroneous. *Id*. at 333; *Pendleton*, 223 Ill. 2d at 473. Manifest error is "error which is clearly evident, plain, and indisputable." (Internal quotation marks omitted.) *Ortiz*, 235 Ill. 2d at 333 (quoting *People v. Morgan*, 212 Ill. 2d 148, 155 (2004)). "[A] decision is manifestly erroneous when the opposite conclusion is clearly evident." *People v. Coleman*, 2013 IL 113307, ¶ 98.

¶ 77    As an initial matter, we note that although this is a consolidated appeal and a stay was granted in the appeal this court docketed under case No. 1-11-1483, we agree with the State that the trial court's initial denial of leave to file a successive postconviction petition is now moot. Whirl makes no arguments regarding this issue on appeal and the trial court ultimately granted leave to file a successive petition and acknowledged that, contrary to the reason given for initially denying leave, Whirl has consistently claimed that his confession was coerced. Therefore, we dismiss appeal No. 1-11-1483 as moot.

¶ 78    In appeal No. 1-14-0801, Whirl contends that the trial court's denial of relief was manifestly erroneous because the trial court applied the wrong legal standard, improperly disregarded the pattern of abusive tactics in which Pienta participated, and failed to draw the appropriate negative inference from the fact that every police officer with relevant evidence chose to exercise his fifth amendment rights rather than testify at the evidentiary hearing. All of these arguments relate to the denial of Whirl's successive postconviction petition following an evidentiary hearing.

¶ 79    In a postconviction hearing, the petitioner must show a denial of a constitutional right by a preponderance of the evidence. *Id*. ¶ 92. In the context of an actual innocence claim pursuant to which a defendant seeks a new trial, the trial court neither decides the ultimate issue of the defendant's guilt nor determines whether the State's evidence is sufficient to convict beyond a reasonable doubt. *Id*. ¶ 97. Otherwise, the remedy would be an acquittal, not a new trial. *Id*. "Probability, not certainty, is the key as the trial court in effect predicts what another jury would likely do, considering all the evidence, both new and old, together." *Id*.

¶ 80    Similarly, in the context of a claim that newly discovered evidence would have likely altered the outcome of a suppression hearing, the purpose of an evidentiary hearing is not for the trial court to determine the ultimate issue of whether a confession was coerced. As Justice McMorrow noted in her dissent in *People v. Maxwell*, 173 Ill. 2d 102, 149 (1996)

(McMorrow, J., dissenting), the issue at this stage of postconviction proceedings is not whether the confession itself was voluntary but whether the outcome of the suppression hearing likely would have differed if the officer who denied harming the defendant had been subject to impeachment based on evidence revealing a pattern of abusive tactics employed by that officer in the interrogation of other suspects. In *People v. Patterson*, 192 Ill. 2d 93, 145 (2000), our supreme court reaffirmed the trial court's role in this context when it remanded the case for a third-stage evidentiary hearing on a torture claim. At the hearing, the trial court was instructed to determine whether "(1) any of the officers who interrogated defendant may have participated in systemic and methodical interrogation abuse present at Area 2 and (2) those officers' credibility at the suppression hearing might have been impeached as a result." *Id.*

¶ 81    With these principles in mind, we consider the trial court's comments at the close of the evidentiary hearing. The trial court first stated that the central issue in the case was whether "Pienta in fact tortured Mr. Whirl and coerced his confession." The court acknowledged that Whirl had not presented new evidence of the torture itself, but concluded that the new evidence regarding Pienta's history of participation in torture was too remote. After turning to the facts of the case and detailing its credibility findings, the court stated:

> "It is my finding that [Whirl] needed to be credible in order to sustain his burden in the case. He was not credible. And it is my finding also after looking very closely at the other issues, *** in fact, that he did not establish that he was abused or tortured by Detective Pienta."

¶ 82    We note that on the basis of the remarks related to whether Whirl had established torture, the trial court appears to have used the incorrect standard for third-stage postconviction proceedings. It was not the trial court's role to determine whether Whirl's confession was, in fact, coerced. But because the trial court also made findings related to the new evidence, and its comments regarding credibility could also be interpreted to relate to those findings, we will examine all of the trial court's findings in detail.

¶ 83    We first address the trial court's credibility findings. As an initial observation, despite the well-settled principle that a trial court's credibility determinations are entitled to deference, the credibility findings at issue here are not related to new witnesses who have come forward and are presenting testimony for the first time, nor is this a situation in which the defendant is providing new testimony that substantively contradicts previous testimony and credibility determinations are therefore critical to the issue that must be determined at an evidentiary hearing. Rather, the trial court's credibility findings here relate to two witnesses: Whirl and, to a lesser extent, Howard, who provided essentially the same testimony they gave at the suppression hearing more than 20 years ago.

¶ 84    Whirl's testimony, both at the suppression hearing and the postconviction hearing, was that Pienta tortured him by slapping him and scraping a key into an existing injury until he confessed. This testimony is not new evidence that Whirl produced for the first time in his successive petition and at the evidentiary hearing. Therefore, the fact that some of the details of his testimony are slightly different now has marginal relevance to the central issue at the evidentiary hearing, *i.e.*, whether the new evidence of a pattern and practice of abusive tactics employed by Pienta, had it been presented at the suppression hearing, would likely have produced a different outcome. Thus, we disagree with the trial court's finding that Whirl "needed to be credible in order to sustain his burden in this case."

¶ 85    However, to the extent the trial court is allowed to consider the old evidence with the new in determining whether the outcome of the suppression hearing would likely have been different, we will briefly address the trial court's findings regarding Whirl's credibility. The issues raised by the trial court involved Whirl's statement that he could not read, his denial that he told Tanya he hoped the police would not try to "pin" Williams' murder on him, and his conflicting statements regarding (1) the potato chip bag, (2) whether Pienta came into the room alone, and (3) whether he was bleeding after Pienta scraped his wound with the key. Finally, the trial court found that there was impeachment regarding the wound itself based on the testimony of both Whirl and Howard.

¶ 86    The first two findings are not supported by the record. Whirl explained that he could not read the statement because he did not have his glasses. Whirl never claimed to be illiterate. It is also clear from the record that Whirl initially denied telling Tanya that he hoped the police would not try to "pin" the murder on him because he wanted to be able to explain the circumstances surrounding the comment, something he was able to do when questioned by his own attorney.

¶ 87    We do not find the statements related to the potato chip bag to be relevant to Whirl's allegations of torture. Whether Whirl initially forgot about the bag or later remembered it but did not remember exactly how it had been used or, in the alternative, even if the potato chip bag was never used in any way and Whirl simply invented that detail and changed it over time, his statements about the bag in no way added to or detracted from his consistent allegations that Pienta abused him by slapping him and scraping the wound on his leg with a key. Therefore, we do not see how the trial court's concerns regarding this testimony factor into the ultimate issue of whether the outcome of the suppression hearing would likely have been different had the new evidence regarding Pienta's pattern of torture and abuse been introduced.

¶ 88    Similarly, we do not believe that Whirl's conflicting statements regarding whether Pienta entered the room alone or was accompanied by Marley would have any impact on the probable outcome of the hearing. Whirl has never made any allegations related to Marley but has consistently focused on Pienta's actions. Inconsistent statements related to Marley's presence would therefore have no relevance to the issue of whether subjecting Pienta to impeachment with evidence of his use of abusive tactics would likely have produced a different outcome.

¶ 89    Finally, we do not consider the fact that Whirl thought he was wearing red pants during his interrogation (when a photograph shows him wearing dark pants and a red shirt) and could not remember whether the wound was bleeding dispositive. The injury itself was established by independent evidence at the suppression hearing. Again, it was not the trial court's role to determine whether Whirl had, in fact, been coerced into making a confession. We are not persuaded that the credibility issues in Whirl's testimony identified by the trial court make it less likely that the outcome of the suppression hearing would have been different had Whirl presented evidence of Pienta's pattern and practice of using coercive tactics to obtain confessions.

¶ 90    In summarizing the facts of the case that led to its conclusion that Whirl was not credible, the trial court noted that Whirl pled guilty and that there was no question that his plea in open court was free and voluntary. Yet the record indicates that not only has Whirl consistently claimed his confession was coerced and he had nothing to do with the murder, but he also

very nearly sabotaged any chance of a plea deal and was almost forced to go to trial with no preparation on a capital murder charge by continuing to profess his innocence even after he pled guilty.

¶ 91    The record demonstrates that while Whirl's plea was voluntary in that he chose to accept a 60-year sentence as opposed to a possible death penalty, he continued to profess his innocence. The trial court noted that it had never before encountered a situation where a defendant spontaneously informed the court that he did not commit the crime immediately after the court had accepted a guilty plea and announced the sentence. Multiple adjournments were required while Whirl's attorney attempted to convince Whirl that pleading guilty was his best option after losing the motion to suppress.

¶ 92    Ultimately, Whirl's attorney was only able to salvage the plea deal by convincing Whirl to tell the court that he claimed not to have committed the murder only because he was afraid of doing time in the penitentiary. Moreover, the fact that Whirl pled guilty after the motion to suppress was denied has no bearing on the issue of whether the outcome of the suppression hearing would likely have been different had the new evidence been presented.

¶ 93    We further note that the trial court's findings regarding impeachment on the issue of the actual wound are not only irrelevant to the determination the trial court needed to make at the evidentiary hearing but are also belied by the record. Whirl did not present any new evidence on the wound at the evidentiary hearing. Rather, the injury was previously established at the suppression hearing. Unfortunately, it appears that the photographic evidence available at the time has now been lost, but that evidence is documented in the record through the testimony of witnesses at the suppression hearing.

¶ 94    Howard, who even the State conceded at the suppression hearing was a credible witness, testified that immediately after the interrogation, Whirl's wound was raw and just starting to clot, in contrast to the photograph taken at a later point in time that showed scabbing. Whirl's mother also viewed the photograph and said that the wound in the photograph was wider than the injury she had seen prior to the time Whirl was taken into custody. Most importantly, the parties stipulated that a doctor prescribed a dressing for a wound on Whirl's leg after he was processed into the jail, treatment that would have been unnecessary unless the wound on Whirl's leg had been reopened during the time he was in custody.

¶ 95    Despite the trial court's finding on the original motion to suppress, the record shows that the State did not produce any evidence to indicate that the injury established by this evidence was inflicted by someone other than Pienta. See *Maxwell*, 173 Ill. 2d at 121 (citing *People v. Wilson*, 116 Ill. 2d 29, 40 (1987)); *People v. Woods*, 184 Ill. 2d 130, 146 (1998) (where it is evident that a defendant received injuries while in police custody and the only question is how and why the injuries were sustained, the State is held to the higher standard of establishing, by clear and convincing evidence, that such injuries were not inflicted by police officers to induce the defendant's confession).

¶ 96    In fact, testimony by two police officers at the hearing on the motion to suppress provides additional support for Whirl's claim that the original injury was aggravated during his interrogation. Duffy testified that when he interviewed Whirl shortly after his arrest, the injury was not bleeding but was scabbed over and healing. Pienta also initially testified that it was an "older injury" that was scabbed over and healing. Even after Pienta eventually acknowledged on cross-examination that the injury was only a few days old, he continued to maintain that it was scabbed over and healing at the time of the interview. Thus, in light of

the testimony that immediately after the interrogation the injury was raw and just starting to clot, and the medical evidence that a dressing was prescribed for the wound, something that would not have been necessary had the wound indeed been scabbed over and healing as both detectives testified, the injury itself was definitively established at the suppression hearing.

¶ 97     Because evidence of the wound was not new evidence, it also had marginal relevance to the trial court's determination at the evidentiary hearing on the ultimate issue of whether the new evidence of a pattern and practice of abusive tactics employed by Pienta, if presented at the suppression hearing, would have likely produced a different outcome. To the extent that the trial court believed that minor discrepancies in the testimony regarding the wound meant the outcome would not likely have been different even in light of the new evidence, we conclude the record establishes the opposite conclusion.

¶ 98     We now address the trial court's findings regarding the new evidence. The court acknowledged the pervasive evidence that Burge and many of the officers working under him regularly engaged in the physical abuse and torture of suspects with the goal of extracting confessions. The trial court further acknowledged that Whirl's claims of torture were strikingly similar to other claims, the officer involved was identified in other allegations of torture, and Whirl's allegations were consistent with the findings of systemic and methodical torture at Area 2 under Burge.

¶ 99     But in explaining its finding that the evidence regarding Pienta was too remote, the trial court stated:

"It is clear from those allegations that though [Pienta] is involved in many of the cases, he is not the central figure in those torture allegations. In many of the cases he was the person arresting and transporting individuals who became–who were then tortured by Burge and others. And I'm not downplaying that of course, that involvement. It is true that he is involved in cases but typically he is not the central figure, much less is he acting alone as he is alleged to have done here by Mr. Whirl."

The trial court also noted that Burge was no longer at Area 2 at the time of Whirl's arrest, having been reassigned to Area 3 several years earlier.

¶ 100     Although the most recent torture allegation cited by Whirl occurred in 1986, four years prior to his arrest, our supreme court has noted that a series of incidents spanning several years can be relevant to establishing a pattern and practice of torture. *Patterson*, 192 Ill. 2d at 140. This court has held that incidents spanning several years in which the most recent was five years prior to the defendant's arrest were relevant and admissible. *People v. Reyes*, 369 Ill. App. 3d 1, 19 (2006). We agree with Whirl that the new evidence establishes a pattern and practice of abuse that is not too remote in terms of years.

¶ 101     But the record does not support the trial court's conclusions regarding remoteness related to the extent of Pienta's involvement in other torture cases. Pienta took a lead role in the torture of Patterson in April 1986. See *Patterson*, 192 Ill. 2d at 116 (Pienta entered the interview room with four other officers, said he did not know about the rest of them but he was "about ready to kick [Patterson's] ass," handcuffed Patterson's hands behind his back, slapped Patterson in the chest, and put his hands around Patterson's neck). Pienta was one of the detectives who arrested Caine, Patterson's codefendant, participated in Caine's interrogation, and hit Caine in the chest and threatened him with the same treatment that had been inflicted on Patterson. Pienta was also identified as one of the officers involved in the torture of Wilson in 1982, which involved punching, kicking, suffocation, electric shocks,

- 17 -

and being burned on a radiator. *Id*. at 118. Finally, Houston was arrested in October 1986 and was struck in the face and stomach by Pienta during his interrogation before he was released without being charged.

¶ 102    Apart from torture cases in which Pienta took an active role, the evidence establishes that Pienta was identified as being present in numerous cases involving torture. Contrary to the trial court's assertion, Pienta was not merely the arresting officer but was also, at the very least, present during interviews where suspects were tortured and abused and was one of several detectives working with Burge who routinely engaged in using force to obtain confessions. Our supreme court noted that in the evidence provided by Patterson in his postconviction proceedings, Pienta was identified in five torture cases involving suffocation and/or beatings while under Burge's supervision. *Id*. at 142. Pienta was present for the interrogations of both Holmes (1973) and Diggins (1985). Pienta was involved in not just the arrests but also the interrogations of Michael Coleman and Derrick King (1980), both of whom were beaten until they eventually confessed. Finally, although Cleveland was eventually released with no charges, Pienta was present for Cleveland's interrogation in October 1986, during which Cleveland alleged that his interrogators slammed his head against a table. We believe all of this evidence supports a finding that Pienta was directly involved in a pattern of torture at Area 2.

¶ 103    But even if the new evidence established only that Pienta stood by and did nothing while other officers committed acts of torture and abuse, silent acceptance is still relevant to the issue of whether Pienta's credibility may have been impeached as a result of this evidence. See *People v. Jakes*, 2013 IL App (1st) 113057, ¶ 32 (holding that the silent acceptance by one officer of a crime committed by a fellow officer is relevant to the first officer's credibility). Thus, the evidence presented at the evidentiary hearing was more than sufficient to establish a pattern and practice of torture and abusive tactics by Pienta and is not, as the trial court concluded, too remote.

¶ 104    We also disagree with the significance placed by the trial court on the fact that Burge was no longer at Area 2 at the time of Whirl's arrest. The evidence clearly establishes a long history, going back to at least 1973, of Pienta's involvement in abusing suspects in order to obtain confessions. The only evidence of change appears to be that the methods became less brutal over time and more care was taken to avoid causing detectable injuries. Pienta continued to work in violent crimes at Area 2 after Burge was transferred. There is no basis to assume Pienta's use of physical force to obtain confessions ceased simply because Burge was transferred to Area 3 while Pienta remained at Area 2. Indeed, the allegations related to Houston and Cleveland arose after Burge left Area 2. And, as Whirl points out, Burge's transfer to Area 3 was a promotion and, thus, his departure would not dissuade officers like Pienta from continuing to "solve" cases by means of coerced confessions.

¶ 105    Pienta was again given the opportunity to rebut Whirl's allegations of torture at the evidentiary hearing. Instead, not only did he invoke his fifth amendment rights with regard to Whirl, he also invoked those rights regarding every other case in which he has been identified as a participant in torture and abuse over the course of nearly two decades. Marley, who was present during Whirl's interrogation according to evidence adduced at the suppression hearing, also invoked his fifth amendment rights at the evidentiary hearing.

¶ 106    A postconviction proceeding, as a collateral attack on the judgment of conviction, is civil in nature. *People v. Johnson*, 191 Ill. 2d 257, 270 (2000). "It is the prevailing rule that the

Fifth Amendment does not forbid adverse inferences against parties in civil actions when they refuse to testify in response to probative evidence offered against them." (Internal quotation marks omitted.) *People v. $1,124,905 U.S. Currency & One 1988 Chevrolet Astro Van*, 177 Ill. 2d 314, 332 (1997) (quoting *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976)).

¶ 107    We recognize that although a court may draw a negative inference from a party's refusal to testify, it is not required to do so. Yet given that the State produced no evidence to rebut the evidence of torture and abuse by Pienta, we believe Pienta's invocation of his fifth amendment rights is significant and a negative inference should have been drawn. Instead, when discussing the evidence that was presented at the suppression hearing, the trial court mentioned in passing that Pienta had taken the fifth amendment at the evidentiary hearing, but appeared to give more weight to the fact that the original judge had not found Whirl credible at the suppression hearing than to the fact that Pienta refused to testify at the evidentiary hearing.

¶ 108    In *Coleman*, our supreme court held that the new evidence provided at a third-stage evidentiary hearing, when weighed against the State's original evidence, was conclusive enough that another trier of fact would probably reach a different result and, therefore, the trial court's opposite conclusion was manifestly erroneous. *Coleman*, 2013 IL 113307, ¶¶ 113-14. The record before us supports the same conclusion here.

¶ 109    Without Whirl's confession, the State's case was nonexistent. It consisted of fingerprints on the passenger door of a cab, a public conveyance that Whirl has never denied taking. There were no fingerprints recovered from inside the cab, even though, according to Whirl's statement, he reached forward after shooting Williams to put the cab in park. The murder weapon was never recovered, even though, again according to Whirl's statement, he discarded it in a public park a short distance from the scene of the murder. And there were no eyewitnesses to the murder. Moreover, according to the police report, one witness observed two black males getting into the cab shortly before the murder. Finally, the State presented no evidence at the hearing to rebut Whirl's allegations of torture, and Pienta, who testified at the suppression hearing, invoked his fifth amendment rights at the evidentiary hearing.

¶ 110    The new evidence presented at the postconviction hearing, when weighed against the State's original evidence, was conclusive enough that the outcome of the suppression hearing likely would have been different if Pienta had been subject to impeachment based on evidence of abusive tactics he employed in the interrogation of other suspects. Indeed, it is impossible to conceive of how the State could prevail at a new suppression hearing with the officer alleged to have coerced a suspect's confession invoking his privilege against self-incrimination. Therefore, the trial court's conclusion was manifestly erroneous and we reverse and remand with directions that the guilty plea be vacated and Whirl receive a new suppression hearing and, if necessary, a trial.

¶ 111    Because we have determined that Whirl is entitled to a new suppression hearing under the Postconviction Act, we need not address Whirl's claim for the identical relief under the Torture Inquiry Act. Further, we need also not address Whirl's claim of a *Brady* violation as an additional basis for postconviction relief.

¶ 112                                   CONCLUSION

¶ 113    The trial court's denial of Whirl's successive postconviction petition was manifestly erroneous where (1) the trial court improperly decided the issue of whether Whirl's

confession was, in fact, coerced, (2) the credibility findings made by the court were not relevant to the issue of whether Pienta's credibility at the suppression hearing might have been impeached as a result of the new evidence that Pienta participated in systematic abuse and torture, and (3) the new evidence together with Pienta's invocation of his fifth amendment rights, when weighed against the State's original evidence, was conclusive enough that the outcome of the suppression hearing likely would have been different had that evidence been presented. We reverse and remand with directions that Whirl's guilty plea be vacated and Whirl receive a new suppression hearing and, if necessary, a trial.

¶ 114       No. 1-11-1483, appeal dismissed.

¶ 115       No. 1-14-0801, reversed and remanded with directions.