2022 IL App (1st) 201256-U

No. 1-20-1256

Second Division
June 21, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

|  |  |  |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 92 CR 25596 |
| CLAYBORN SMITH, | ) ) | Honorable Alfredo Maldonado |
| Defendant-Appellant, | ) | Judge, presiding. |

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Lavin concurred in the judgment.

**ORDER**

¶ 1    *Held*: We reverse the circuit court's denial of relief upon a referral from the Illinois Torture Inquiry and Relief Commission where defendant sufficiently established that the result of his suppression hearing would likely have been different had the interrogating officers been impeached with new evidence that they employed a pattern of abusive tactics in other cases. The matter is remanded for a new suppression hearing.

¶ 2 Following a bench trial, defendant Clayborn Smith was convicted and sentenced to life in prison for the 1992 murders of his grandfather, Miller Tims (Miller), and his great aunt, Ruby Bivens, as well as other related offenses. Among the evidence presented against defendant was his court-reported confession given after interrogation at Area 1 in Chicago. In 2011, defendant submitted a claim to the Illinois Torture Inquiry and Relief Commission (TIRC) pursuant to the Illinois Torture Inquiry and Relief Commission Act (Act) (775 ILCS 40/1 *et seq.* (West 2010)), alleging that his confession was false and the product of physical abuse at the hands of Chicago police detectives Kenneth Boudreau, John Halloran, and James O'Brien. The TIRC referred defendant's claim for judicial review, but the circuit court denied relief after holding an evidentiary hearing. Defendant now appeals, and we reverse.

¶ 3                                  I. BACKGROUND

¶ 4                              A. Defendant's Confession

¶ 5 Defendant was arrested on October 20, 1992, and, just after midnight on October 22, gave the court-reported confession at the center of this appeal. The transcript of the confession reveals the following.

¶ 6 Assistant State's Attorney (ASA) Laura Lambur, Certified Shorthand Reporter Timothy Bennett, and Boudreau were present for the statement. Defendant was read his *Miranda* rights and informed of Lambur's role as a prosecutor. He acknowledged that he understood this information and wished to make a statement.

¶ 7 Defendant then stated that on October 17, 1992, he went to Miller's home on Racine Avenue in Chicago. He arrived at 7:43 p.m., which he knew because he noted the time on a clock upon entry. Miller, Bivens, and Herbert Tims, defendant's great uncle, were in the home.

Defendant explained to Miller that he and his girlfriend, Karen Tate, were behind on their rent and needed money or a place to stay. However, Miller said that he could not help them.

¶ 8       The conversation moved into the kitchen, where things became more heated. During the argument, defendant grabbed a pan from Miller's hand and used it to hit Miller in the head. The two then struggled over a knife until the knife broke. Defendant punched Miller, sending him to the ground. As Miller made multiple attempts to regain his footing, defendant assaulted him with various household items such as a stepladder, a lamp, and a fork.

¶ 9       At some point, Bivens emerged from a bedroom. Defendant pushed her to the ground and told her to stay down. They argued, and defendant hit Bivens in the head with an iron several times. She never got up again.

¶ 10      Defendant then left the house and ran into an alley, where he placed his bloody shirt in a trash can. Defendant returned to his apartment building and found his friend Jimmy McDonald, who also lived in the building. Defendant stashed the rest of his clothes at McDonald's apartment and changed into some of McDonald's clothes.

¶ 11      Next, defendant returned to his grandfather's house to find Miller and Bivens in the same spots as when he left. Herbert, who had both legs amputated, was still eating at the kitchen table.[1] Defendant hit Herbert with a skillet. He also took Miller's wallet and Bivens' purse. Finally, defendant retrieved a can of gasoline from the basement, poured some on Miller and the surrounding area, and ignited the gasoline with matches before leaving.

---

[1] The record indicates Herbert had cognitive disabilities as well, though defendant denied this during his testimony at the evidentiary hearing.

¶ 12    After a while, defendant met up with his friend Clinton Tramble and the two smoked drugs together. Afterwards, Tramble and another man, Leo Green, attempted to withdraw cash from an ATM with Miller's stolen bank cards. However, they were unsuccessful.

¶ 13    The transcript of defendant's statement also indicates that he replied, "fair, nice" when Lambur asked him how he had been treated while in custody. He denied being threatened or made promises in exchange for his statement and acknowledged that he was offered food, drinks, cigarettes, and bathroom breaks. Lambur informed defendant that they would review the statement together after the court reporter typed it up, and defendant would get an opportunity to make any additions or corrections he saw fit. However, defendant responded, "I just wish you type it from there. I don't want to change nothing. That is right there is all better when you drew up the first [*sic*]." Lambur asked, "You mean when you and I first talked about it the first time?" Defendant answered, "yes."

¶ 14    Defendant, Lambur, and Boudreau signed at the bottom of all 22 pages of the statement. Three of the pages contain minor, non-substantive corrections, which were also initialed by defendant, Lambur, and Boudreau.

¶ 15                              B. Motion to Suppress

¶ 16    Prior to trial, defendant filed a motion to suppress the confession, alleging that the interrogating detectives extracted the confession through physical coercion and threats against him and Tate.

¶ 17                         1. Defendant's Suppression Testimony

¶ 18    At the suppression hearing, defendant testified that he was arrested on the morning of October 20, 1992, and brought to Area 1. Boudreau and Halloran took him to an interview room on the second floor and handcuffed his right hand to a ring on the wall. The detectives stated that

Tate was also in custody and that "it would be best" to tell them what he knew so that they "could hurry up and get things over with and everybody could go home." Defendant told them that he was at home on the day in question and did not know anything about the murders. Halloran screamed at defendant and accused him of lying, but defendant continued to deny any knowledge of the crimes. Eventually, Halloran started hitting defendant in the head with an open hand. When defendant still did not respond to questioning, Halloran cursed at defendant and started kicking his legs.

¶ 19    Boudreau then asked the other detectives to leave the room. Once they were alone, Boudreau told defendant that the police knew he was involved, but that the crimes were not premediated. Boudreau also stated that defendant could either cooperate or he would "let that crazy bastard [Halloran] back in." Boudreau then left the room to "give [defendant] a minute to think about what he said."

¶ 20    When Boudreau returned, he told defendant that Tate (who was pregnant at the time) was in custody crying. Boudreau suggested and that defendant should give a statement if he "didn't want to see [her] go to jail and lose the baby and all of that[.]" However, defendant continued to refuse to answer any questions, so Boudreau left the room.

¶ 21    Later on, two other detectives entered the room. One of them smacked defendant and asked him if he was ready to make a statement. Defendant did not respond, so one of the detectives held defendant by his hair while the other grabbed him by the collar and "punched [him] a little bit." They told defendant that other witnesses had implicated him, and that Tate would go to jail for murder and have her baby taken away.

¶ 22    The detectives left and, sometime later, Boudreau and Halloran returned to the interview room. Boudreau told defendant that "everybody was pointing the finger" at him. Defendant

became upset, telling the detectives to "get the fuck out of [his] face" because he had nothing to say. Halloran grabbed defendant by his braids, pushed him up against the wall, and ordered him to take off his shoes. Boudreau removed defendant's shoes and socks because defendant refused to comply. The detectives did not take the shoes and socks, but threw them in the corner of the interrogation room.

¶ 23    Defendant was then alone in the room for a while until Boudreau returned. Boudreau again suggested defendant make a statement, possibly saying that he acted in self-defense, so that Tate would not go to jail or lose the baby. He informed defendant that Tate was crying and that Halloran "had been in the room with her for a long time." Boudreau also told defendant he could "help [him] and get [him] off" if he told a good story, even if he had to make something up. Halloran then came into the room and said that defendant would either talk by choice or by force. Halloran kicked defendant, grabbed him by the braids, and hit him in the head several times.

¶ 24    The detective then left and came back. Halloran started pulling defendant's braids again and said he would not stop until defendant talked. Defendant insisted he would not talk without a lawyer, and Halloran left. Boudreau told defendant that he should talk or else "that bastard" Halloran would keep coming in to pull his hair.

¶ 25    Sometime later, Boudreau and another detective came in and showed defendant a pink piece of paper that they claimed proved blood was found on defendant's shoes. However, defendant said that they could not have tested his shoes because they were still in the corner of the interview room. The detectives took defendant downstairs to the lockup area, where he was booked and placed in a cell. At some point, he was taken to the second floor and placed in a lineup before being taken back down to the lockup area.

¶ 26 Eventually, an officer came to take defendant back up to the interview room, but he refused to go. Defendant only agreed to go upstairs after he was told that a lawyer was there waiting for him. However, Lambur was the one waiting for him. Defendant was handcuffed to a chair and informed that Lambur was a prosecutor, not his attorney. Realizing he had been tricked, defendant became upset and cursed at Lambur. Boudreau dragged defendant out of the room by the chair he was handcuffed to and scolded him for "disrespecting" Lambur. Boudreau unhandcuffed defendant and took him to an area where, through a glass partition, he could see Lambur talking to Tramble and Green.

¶ 27 Defendant was then brought back to the interview room and handcuffed to the wall again. Lambur came in and started asking him questions. Defendant told her that he was at home with Tate on October 17 and only briefly left once to go to the store. Lambur stated she would have defendant's statement typed up, and left.

¶ 28 Halloran came in and claimed that Tate did not corroborate defendant's alibi. Halloran grabbed defendant and they started to scuffle. Halloran called out to O'Brien, who then entered the room. O'Brien pulled defendant's fingers back while Halloran punched him.

¶ 29 Later, Lambur returned with a court reporter and began asking defendant questions. This time, defendant falsely confessed to the murders because he was worn down and could no longer resist. When the questioning was over, defendant was presented with the typed statement from the court reporter. He initially refused to sign it, but eventually did so after the detectives pressured him. Defendant did not make any corrections but complied with Lambur's instructions to sign where she made corrections.

¶ 30 Defendant testified that when he said "I just wish you type it up from there" during his statement, he meant that he wanted Lambur to type up his earlier statement where he told her he

was at home during the murders. Defendant also explained that certain pauses in the statement were where Boudreau interjected and coached him to say specific details.

¶ 31 Defendant further testified that he told the public defender assigned to him in bond court that the police had hit him and pulled his hair. The public defender arranged to have defendant photographed. Defendant was shown the photographs during his testimony, and he stated that they showed a bruise on his forehead and his braids pulled apart.

¶ 32                                    2. Roderick Sisson

¶ 33 Roderick Sisson, who was 17 years old at the time, also testified for the defense. Sisson testified that he was arrested on either October 20 or 21, 1992 and brought to Area 1. He told the detectives who interviewed him that he did not know anything about the murders, but they did not believe him. One of the detectives threatened to "smack the shit out of" him if other witnesses contradicted his story.

¶ 34 At some point, Sisson was alone in an interview room when he heard defendant in the next room loudly telling officers to leave him alone and that he wanted a lawyer. Sisson also heard a "loud bumping on the wall" and the sound of the door closing. Sisson tapped on the wall and asked if defendant was all right, to which defendant replied, "they just roughed me up." Defendant corroborated this conversation during his own suppression hearing testimony.

¶ 35 On cross-examination, Sisson explained that he knew defendant's voice because they were both members of the Mickey Cobra street gang at the time. On re-direct examination, Sisson testified that he did not mention the threat against him or the conversation with defendant because he was scared and "just went by whatever they said."

¶ 36                                    3. Karen Tate

¶ 37    Tate testified that she was defendant's girlfriend and six months pregnant at the time of the murders. Boudreau and another detective picked her up at her father's house on the evening of October 19, 1992 and took her to Area 1, where she remained until the morning of October 21. She saw defendant at the police station that morning and noticed that his hair was "real wild" and that his clothes were "kind of hanging off" him.

¶ 38                                    4. Detective Boudreau

¶ 39    The State called Boudreau, who testified that he participated in defendant's arrest on the morning of October 20, 1992. Defendant was taken to Area 1, where he was read his *Miranda* rights and interrogated by Boudreau and Halloran. During the approximately 20-minute initial interview, defendant denied involvement and provided an alibi.

¶ 40    After further investigation, Boudreau and Halloran spoke to defendant again around 8 p.m. on October 21. Defendant was re-read his *Miranda* rights and, over the course of an hour-long conversation, admitted to committing the murders.

¶ 41    Shortly thereafter, Lambur entered the room and read defendant his *Miranda* rights. He agreed to speak to her and again admitted to the murders "in graphic detail." Lambur and defendant next went over different ways of memorializing the statement. Lambur then spoke to defendant alone for a few minutes. A court reporter arrived a little bit later, and defendant gave a court-reported confession in the presence of the reporter, Boudreau, and Lambur.

¶ 42    Boudreau further testified that neither he nor anyone in his presence ever hit or kicked defendant. Defendant never complained to him about being physically abused. Boudreau also denied that he or anyone else in his presence ever told defendant that he and Tate would not be charged with murder or have their baby taken away if defendant made a statement. Defendant never requested a lawyer in Boudreau's presence.

¶ 43     Additionally, Boudreau explained that detectives confiscated defendant's shoes because there was blood on them, but did not remove his socks. Boudreau denied that defendant was handcuffed while in the interview room at Area 1. Rather, he was secured only by the locked door.

¶ 44                                    5. Detective O'Brien

¶ 45     O'Brien testified that he was assigned to Area 1 in October 1992, but was not there during the time defendant was in custody because he was attending an in-service training on those days. Based on a review of his timecard, O'Brien testified that he did not return to Area 1 until 4:30 p.m. on October 22, well after defendant's confession. O'Brien testified that he brought his timecard with him, but it was apparently not admitted into evidence.

¶ 46                                    6. Detective Halloran

¶ 47     Halloran testified that neither he nor anyone in his presence ever slapped, punched, or kicked defendant. He also denied that he or anyone else ever promised defendant leniency or not to charge Tate in exchange for defendant making a statement. According to Halloran, defendant unbraided his own hair as he was being interviewed.

¶ 48                                    7. ASA Lambur

¶ 49     Finally, Lambur testified that she was assigned to Felony Review in October 1992 and took defendant's court-reported statement in the presence of Boudreau. She denied witnessing any detective slap, punch, or kick defendant. Defendant never told her that he was abused by the police, and she did not observe any injuries on him. Lambur also denied that defendant was dragged from the room for cursing at her. Lambur further explained that defendant was "always messing with his hair" when she spoke to him.

¶ 50     On cross-examination, Lambur testified that defendant did not say he did not want to talk during their first meeting. He was not handcuffed, and he did not provide an alibi or deny being at

Miller's house. Lambur further testified that Boudreau was the only detective present when she spoke to defendant, and that Boudreau did not interject when she took the court-reported statement. Lambur had "no clue" what defendant meant when he said "I just wish you type it up from there" because his court-reported statement was substantively identical to what he told her during their first conversation.

¶ 51                    8. Denial of Motion to Suppress

¶ 52    Following the testimony, the trial court denied the motion to suppress, ruling that the State had proven the confession was "freely and voluntarily given" under the totality of the circumstances.

¶ 53                    C. Trial and Postconviction Filings

¶ 54    The case proceeded to a bench trial, after which defendant was found guilty of the murders of Miller and Bivens, the attempted murder of Herbert, and aggravated arson. He was sentenced to natural life in prison.

¶ 55    On appeal, defendant argued, *inter alia*, that his motion to suppress should have been granted. We noted that there was conflicting evidence as to the voluntariness of defendant's statement, but that it was ultimately the trial court's role to determine whether defendant or the State's witnesses were more credible. Because we found the trial court's determination in favor of the State was not unreasonable, we affirmed the denial of the motion to suppress. *People v. Smith*, No. 1-94-2521 (unpublished order under Illinois Supreme Court Rule 23).

¶ 56    In 1997, defendant filed a postconviction petition raising the claim that his confession was coerced. However, the petition was summarily dismissed at the first stage, and we affirmed that dismissal on appeal. *People v. Smith*, No. 1-97-2929 (unpublished order under Illinois Supreme Court Rule 23).

¶ 57    In 2000, defendant again raised the coercion claim in a federal petition for a writ of *habeas corpus*. However, the district court denied the petition without deciding on the voluntariness of defendant's confession because it determined the other evidence of his guilt was "overwhelming." *United States ex rel. Smith v. Walls*, 208 F.Supp.2d 884, 888-89 (N.D. Ill. 2002).

¶ 58    Defendant also filed a civil action against Boudreau, Halloran, O'Brien, and the City of Chicago in 2003, which was ultimately dismissed on procedural grounds. *Smith v. Boudreau*, 366 Ill. App. 3d 958 (2006).

¶ 59                                    D. TIRC Proceedings

¶ 60    In 2011, defendant filed a claim under the Act with the TIRC. On May 20, 2013, the TIRC issued a disposition finding "sufficient evidence of torture to conclude that the [c]laim is credible and merits judicial review for appropriate relief." The TIRC reasoned that defendant's allegations have been consistent over the years and that some details of his confession conflicted with other physical evidence in the case. The TIRC also found defendant's allegations "strikingly similar" to other claims of torture, noting that TIRC records showed the Halloran, Boudreau, and O'Brien had each been accused of abuse in at least 35 different cases, some of which involved false confessions from defendants who were later exonerated.

¶ 61                              E. Post-TIRC Evidentiary Hearing

¶ 62                                  1. Defendant's Testimony

¶ 63    Based on the TIRC's referral, defendant's claim advanced to an evidentiary hearing before the circuit court beginning on March 2, 2018. At the hearing, defendant called himself as his only live witness and gave an account substantively identical to his testimony at the original suppression hearing. To summarize, defendant testified that the detectives, primarily Halloran, hit him, kicked him, and pulled his hair on multiple occasions while he was handcuffed in an interview room at

Area 1. O'Brien also came into the room at some point and pulled defendant's fingers back. Boudreau and other detectives pressured him to make a statement to make things easier on himself, Tate, and their unborn baby.

¶ 64    When defendant was tricked into meeting with Lambur, he cursed and "went off" on her and initially denied any involvement in the murders. Defendant then eventually gave an incriminating statement to Lambur with Boudreau interjecting to feed him details about the crimes.

¶ 65                                    2. ASA Lambur's Testimony

¶ 66    Lambur[2] also testified consistently with her suppression hearing testimony. According to her, defendant was not handcuffed, never cursed at her, and never denied involvement in the murders. Lambur also denied that defendant was removed from the room by detectives. She took defendant's court-reported statement while Boudreau was in the room, but Boudreau did not make any comments that were not transcribed by the court reporter. No other detectives were present at the time. Defendant put his head in his hands and touched his hair frequently during their interviews. Lambur never witnessed any physical abuse or threats against defendant, and he did not complain to her about any such abuse or threats, even when she briefly spoke to him alone.

¶ 67                                    3. Detective Boudreau's Testimony

¶ 68    Boudreau testified that he was assigned to Area 1 at the time of defendant's arrest but had previously worked under Jon Burge at Area 3 for about four months. Boudreau was part of the team that arrested defendant and transported him to Area 1. Boudreau denied that any abuse occurred during that trip.

---

[2] Since the trial proceedings, Lambur married and took the surname Hynes. However, we will use her maiden name for consistency.

¶ 69    Boudreau's testimony about the events at Area 1 was consistent with his suppression hearing testimony. Defendant gave an alibi, which detectives believed to be false based on their conversation with Tate. Detectives confiscated defendant's shoes because they had blood on them but they did not take his socks. Boudreau did not see anybody hit, kick, or pull defendant's hair, and nobody made any threats or promises to defendant regarding himself, Tate, or their unborn baby. Defendant was not handcuffed while in the interview room. O'Brien was not present for any of the interviews.

¶ 70    Defendant gave the recorded statement in the presence of Boudreau, Lambur, and the court reporter. Boudreau testified that he did not suggest any answers or say anything that was not transcribed by the court reporter.

¶ 71    On cross-examination, Boudreau acknowledged that he was reprimanded in 1991 for obtaining a statement from a juvenile without an adult present in connection with a different case. He also acknowledged that he asserted his fifth amendment right to remain silent when questioned as part of Special State's Attorney Edward Egan's investigation into police misconduct. Boudreau was further questioned about numerous cases in which defendants alleged police misconduct, including the cases of Derrick Flewellen, Michael Sanders, Nevest Coleman, Kilroy Watkins, Marcus Wiggins, Harold Hill, Johnny Plummer, Tyrone Hood, Alfonzia Neal, Jonathon Tolliver, Emmett White, Charles Johnson, Larod Styles, LaShawn Ezell, and Troshawn McCoy. He denied all allegations of abuse against him. However, he acknowledged that he personally agreed to pay $7500 to settle a civil suit involving Harold Hill and Dan Young.

¶ 72                                    4. Detective Halloran's Testimony

¶ 73    Halloran testified that he was Boudreau's partner at Area 1 during October 1992. He was previously assigned to Area 3 under Burge, but never worked with him directly.

¶ 74    Halloran's testimony regarding defendant's interrogation was consistent with his account at the suppression hearing. Halloran stated that he only had two interviews with defendant: a brief, initial one in which defendant raised an alibi and another in which defendant admitted to the murders after being confronted him with that the evidence the detectives had gathered. Halloran denied that defendant or any other interviewee in the case was abused, threatened, or made promises in exchange for a statement. Halloran testified that defendant frequently played with and unbraided his own hair while at Area 1.

¶ 75    Halloran acknowledged that he invoked the fifth amendment in a 2008 deposition related to a civil case filed by Harold Hill, including in response to questions about defendant. However, Halloran explained that he subsequently answered those questions in a later deposition. Halloran also acknowledged that, like Boudreau, he personally agreed to pay $7500 as part of the settlement in the Hill civil case. Halloran was further asked about his behavior in numerous other cases involving allegations of physical abuse, including the cases of Eric Gomez, Oscar Gomez, Abel Quinones, Harold Hill, Tyrone Hood, Wayne Washington, Derrick Flewellen, Nicholas Escamilla, George Anderson, Nevest Coleman, William Lee Hughes, John Wiler, Miguel Morales, Raphael Robinson, Tyrone Reyna, Antonio Tollfree, Mickey Grayer, and Sheila Crosby. He denied any wrongdoing in those cases.

¶ 76                              5. Detective O'Brien's Testimony

¶ 77    O'Brien also testified consistently with his suppression hearing testimony. Specifically, O'Brien stated that he was never at Area 1 while defendant was in custody because he was at an in-service training at a different location. When asked about numerous other cases, O'Brien denied abusing Cortez Brown, Oscar Gomez, Stephen Riley, Glenn Dixon, Antonio Nicolas, George Anderson, Jovan Deloney, Harold Hill, or Nevest Coleman.

¶ 78                       6. Pattern and Practice Evidence

¶ 79    As "pattern and practice" evidence, defendant also submitted approximately 80 exhibits relating to allegations of abuse in other cases. These exhibits included information concerning suspects and witnesses such as Kilroy Watkins, Marcus Wiggins, Eric Gomez, Oscar Gomez, Harold Hill, Dan Young, Rudy Davila, David Fauntleroy, James Andrews, Cortez Brown, Alfonzia Neal, William Ephraim, Willie Lee Hughes, John Willer, Miguel Morales, Ralphael Robinson, Nicholas Escamilla, Michael Taylor, Mali Taylor, Kylin Little, Jason Miller, Andre Brown, Antwan Holiday, George Anderson, Malimah Muhammad, Terrice Hartfield, Anthony Blanch, Fred Ewing, Abel Quinones, Derrick Flewellen, Gregory Watkins, Robert Wilson, Donnell Edwards, Josephus Jackson, Antoine Anderson, Francis Bell, Jesse Clemons, Ivan Smith, LaMontreal Glinsey, Anthony Jakes, Johnny Plummer, Jonathon Tolliver, Steven Riley, Peter Williams, Tyrone Reyna, Terrance Brooks, Ramone McGowan, Dorcus Withers, Harold Richardson, Larod Styles, Terrill Swift, Lindsey Anderson, Nevest Coleman, Arnold Day, Ralph Wilson, Enrique Valdez, Donnell Edwards, and Curtis Millsap.

¶ 80                       F. Circuit Court's Disposition

¶ 81    After hearing evidence and entertaining additional posthearing briefing, the circuit court rendered its decision in a 51-page written order dated September 20, 2018. The court began by noting that the parties disagreed on the applicable standard of review. The State, citing *People v. Christian*, 2016 IL App (1st) 140030, argued that defendant was required to prove he was tortured, whereas defendant, relying on *People v. Whirl*, 2015 IL App (1st) 111483, argued that he need only show that the result of the suppression hearing would have been different had the interrogating officers been impeached with new evidence suggesting they exhibited a pattern of abusive tactics. The court agreed with defendant and adopted the *Whirl* standard, which it articulated as "(1)

whether the officers who interrogated [defendant] participated in a systematic pattern of abuse in the interrogation of other suspects, and (2) whether the officers who denied abusing [defendant] would have been impeached as a result such that the outcome of this suppression hearing likely would have differed."

¶ 82    On the question of whether defendant had sufficiently established a pattern of abuse, the court opined that defendant's task was "a bit harder" than the defendant in *Whirl*'s because, while there had already been substantial evidence to establish systemic Burge-led abuse at Area 2, the same had not yet been established for Area 1. The court continued its analysis by stating that defendant's evidence, while admittedly "voluminous," was nevertheless "lacking in depth" because much of the evidence had "some feature that works against its persuasiveness."

¶ 83    For example, the court found that many of the cases relied upon by defendant were in turn supported by defendant's allegations, thus rendering them "circular." The court further stated that many of the claims included in defendant's evidence resulted in losing efforts for those claimants, or were simply civil complaints that had (at least as of yet) not resulted in a finding of abuse by Boudreau, Halloran, or O'Brien. Although the court found it particularly "troubling" that Boudreau and Halloran had personally paid money to settle the civil suit involving Harold Hill and Dan Young, the court nevertheless found that instance "ambiguous" for establishing a pattern of abuse because there were no findings on the merits and the suit included some theories of liability that were not premised on police torture. Additionally, the court found that the defendants who had achieved favorable outcomes in court had prevailed for reasons other than their allegations of torture. The court therefore concluded that defendant's evidence "while numerous, is largely ambiguous and not of substantial character to establish conclusively that the officers involved in [defendant's] interrogation participated in systematic abuse."

¶ 84    The court then proceeded to analyze the second prong of the *Whirl* standard, namely whether the result of the suppression hearing would likely have been different had the interrogating detectives been shown to have participated in torture in other cases. The court answered this question in the negative, reasoning that (1) in a previous murder investigation, the same detectives had treated defendant well and released him without charges, (2) defendant presented no evidence of injury and his claim about his braids being pulled out was "refuted" by the State's witness, (3) defendant made an "odd" claim about his shoes being left in the corner of the interrogation room that was "apparently refut[ed]" by a trial stipulation that the shoes were submitted for forensic testing, and (4) defendant's testimony about Boudreau coaching him on what to say was "far from convincing" and "highly improbable." The court also stated that none of defendant's evidence undercut Lambur's testimony, which contradicted defendant on several points and was "essential to the outcome of the suppression hearing."

¶ 85    Finally, the court declined defendant's invitation to draw a negative inference from the detectives' invocation of the fifth amendment in other cases. Specifically, the court stated that the detectives answered all the questions in this case and that there was no indication that they would invoke the fifth amendment if there were to be a new suppression hearing in this case. Thus, the court determined that it was "not persuaded the numerous allegations against these detectives is sufficient to conclude the outcome of [defendant's] suppression hearing would differ."

¶ 86    Defendant filed a motion to reconsider, which was denied. This appeal followed.

¶ 87                                II. ANALYSIS

¶ 88    At the outset, we note that we have received two separate *amicus curiae* briefs in this matter, both from organizations and individuals concerned with the integrity of the Illinois criminal justice system. The first such brief is from a collective of community organizations, including the

Chicago Torture Justice Center, the Chicago Torture Justice Memorials, the Chicago Alliance Against Racism and Political Repression, the NCAAP-Westside Branch, the Judicial Accountability Project, the Brighton Park Neighborhood Council, the Logan Square Neighborhood Association, the Pilsen Alliance, and the Chicago DSA. The second *amicus* brief was filed by a collective describing themselves as "a diverse group of individuals concerned about the integrity of the Illinois criminal justice system," who include "a law firm, a government official, law professors, and leaders of law firms and professional organizations." These *amici* are Robert W. Bennett, David J. Bradford, Linda T. Coberly, Thomas F. Geraghty, Alan Mills, Frederick J. Sperling, Curtis J. Tarver II, Rob Warden, and the law firm Loevy & Loevy. Because both sets of *amici* raise essentially the same arguments as defendant, we will address their contentions together to the extent necessary to resolve this appeal.

¶ 89    The purpose of the Act is to create "an extraordinary procedure to investigate and determine factual claims of torture related to allegations of torture [.]" 775 ILCS 40/10 (West 2010). To effectuate this purpose, the Act established the TIRC, which is an eight-member body composed of a retired circuit court judge, a former prosecutor, a former public defender, a law school professor, a criminal defense attorney, and three members of the public who are not attorneys or affiliated with the judicial branch. *Id.* § 20.

¶ 90    Upon receiving a claim of torture, the TIRC hears the evidence and votes on an appropriate disposition. *Id.* § 45. If at least five of the eight members conclude by a preponderance of the evidence that there is sufficient evidence of torture, the matter is referred to the circuit court for further review. *Id.* § 50.

¶ 91    Judicial review under the Act is akin to a third-stage evidentiary hearing under the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2010)). *People v. Wilson*, 2019 IL App

(1st) 181486, ¶ 51. The circuit court may receive proof by affidavits, depositions, oral testimony, or other evidence. 775 ILCS 40/50 (West 2010). Like in other forms of postconviction proceedings, the Illinois Rules of Evidence do not in apply in cases of TIRC referrals so that defendants may present greater evidence than they could have at trial. *People v. Gibson*, 2018 IL App (1st) 162177, ¶¶ 128. Ultimately, the Act provides defendants a "new procedural device" for proving their claims of police torture. *People v. Johnson*, 2022 IL App (1st) 201371, ¶ 98.

¶ 92    Importantly, the circuit court's purpose in considering a TIRC referral is not to determine the ultimate issue of whether the defendant's confession was coerced. *People v. Whirl*, 2015 IL App (1st) 11483, ¶ 80. Rather, the question is whether the outcome of the original suppression hearing would likely have been different if the officers who denied torturing the defendant had been subject to impeachment based on newly discovered evidence that those officers engaged in a pattern of abusive tactics in other cases. *People v. Galvan*, 2019 IL App (1st) 170150, ¶ 68.

¶ 93    When reviewing a circuit court's decision upon a TIRC referral, this court employs a different standard of review for issues of law and fact. *People v. Tyler*, 2015 IL App (1st) 123470, ¶ 195. We defer to the circuit court's findings of fact unless they are against the manifest weight of the evidence, which occurs only where the opposite conclusion is "clearly evident, plain, and indisputable." *Id.* However, we review the circuit court's rulings on questions of law *de novo*, meaning that we owe no deference to the circuit court and perform the same analysis as the trial judge would. *Id.*

¶ 94                                A. Defendant's Burden

¶ 95    Initially, the parties dispute whether the circuit court applied the correct legal standard in two ways. First, defendant and *amici* contend that the court erroneously inflated his burden under the Act, primarily focusing on the court's statement that the new evidence was "not of substantial

character to establish conclusively that the officers involved in [defendant's] interrogation participated in systemic abuse." However, the court's use of the word "conclusively" in this context appears to derive from its earlier reference to *People v. Patterson*, 191 Ill. 2d 93, 139 (2000), a pre-Act case stating that a defendant is entitled to postconviction relief based on allegations of torture only if his newly discovered evidence is of "such conclusive character that it will probably change the result upon retrial[.]" See also *People v. Coleman*, 2013 IL 113307, ¶ 96 (in the postconviction context, "conclusive" means the new evidence would probably change the result of new proceeding). Additionally, the circuit court explicitly rejected the notion that defendant was required to prove he was tortured, instead adopting the *Whirl* standard that, in the court's words, involved determining "(1) whether the officers who interrogated [defendant] participated in a systematic pattern of abuse in the interrogation of other suspects, and (2) whether the officers who denied abusing [defendant] would have been impeached as a result such that the outcome of this suppression hearing likely would have differed." Thus, it appears that the court understood that defendant was not required to definitively prove that he was tortured.

¶ 96    Second, the State contends that defendant incorrectly argues that he need only establish that the detectives "may have" participated in systematic abuse. The State points out that defendant derives this "may have" language from *People v. Harris*, 2021 IL App (1st) 182172, ¶ 50, which states that "whether any of the officers who interrogated [the] defendant may have participated in systematic interrogation abuse" is but a relevant inquiry to the main question of "whether the outcome of defendant's suppression hearing would have been different if the officers who denied using physical coercion had been subject to impeachment based on defendant's evidence showing a pattern and practice of police abuse." See also *Whirl*, 2015 IL App (1st) 11483, ¶ 80 (the question is whether the suppression hearing would have had a different result due to "impeachment based

on evidence revealing a pattern of abusive tactics"). We see this as a distinction without a difference. As the circuit court acknowledged, a defendant will of course not be able to show the suppression hearing would likely have gone differently without some evidence of a pattern of abuse in other cases. But as *Harris* itself explains, when determining whether new evidence was powerful enough to have likely changed the result of the hearing, " '[p]robability, not certainty, is the key.' " *Harris*, 2021 IL App (1st) 182172, ¶ 57 (quoting *Coleman*, 2013 IL 113307, ¶ 97).

¶ 97                    B. Pattern and Practice Evidence

¶ 98    With these principles in mind, we agree with defendant and *amici* that the circuit court at least improperly weighed the new documentary evidence presented in this case. Generally, the court discounted much of defendant's evidence because none of the defendants in cases presented achieved a specific finding from a court on the merits that they were abused by the subject detectives. However, neither the circuit court nor the State has cited to any authority that a previous judicial determination of torture is required. We reject the existence of such a requirement, as it does not appear in the language of the Act and would make it exceedingly difficult for a defendant to obtain relief. This result would be impossible to square with the Act's extraordinary remedial purposes. *Gibson*, 2018 IL App (1st) 162177, ¶ 136 (making it harder to succeed under the Act than under other forms of postconviction proceedings would "take the 'extraordinary' out of the 'extraordinary procedure to investigate and determine factual claims of torture' that the General Assembly created" in passing the Act); see also *Wilson*, 2019 IL App (1st) 181486, ¶ 52 ("The legislature clearly did not create a new form of postconviction relief with the intent that a petitioner satisfy a heavier burden than that imposed by the Post-Conviction Act."). Instead, all that is necessary under the Act is for the defendant to show that the subject officers would have been impeached with evidence of torture such that the result of the suppression hearing would likely

have been different. *People v. Galvan*, 2019 IL App (1st) 170150, ¶ 68 (remanding for a new suppression hearing despite the fact that none of the other defendants had secured a court ruling that their confession was the product of torture). Again, probability, rather than certainty, is the key, as the court must in effect predict what the trial judge would have done if faced with the new evidence. *Id.* ¶ 67.

¶ 99    In our view, the allegations produced by defendant are more than sufficient and give us great pause. Even if largely unproven in courts of law, the sheer number of allegations and the similarities among them are disconcerting to say the least. Moreover, although they are not definitive findings by a court on the merits, many of the documents produced by defendant go somewhat beyond bare allegations. For example, defendant has shown numerous cases in which individuals claiming abuse by Boudreau or O'Brien have received payment from the City of Chicago under the Reparations for Burge Torture Victims Ordinance (Chicago Ordinance No. SO2015-2687 (approved May 6, 2015)). See *People v. Plummer*, 2021 IL App (1st) 200299, ¶ 94 (fact that reparations were paid "gave credibility" to allegations of torture against Boudreau and another detective). Similarly, there was evidence of multiple civil settlements in cases where defendants alleged torture against the subject detectives, including some in which the defendants were later exonerated. While not definitive proof, we believe that this evidence rises above the level of mere allegations and suggests a pattern of torture. Indeed, even the circuit court acknowledged that it was "troubling" that Halloran and Boudreau had personally agreed to pay money to settle misconduct allegations. More troublingly, defendant produced evidence that at least eight defendants were later exonerated, acquitted, awarded a certificate of innocence, or had their charges dropped even though some combination of Boudreau, Halloran, or O'Brien allegedly extracted a confession from them using torture. Although the circuit court discounted these cases

because the defendants were successful in court for reasons other than their torture claims, the fact remains that they confessed to crimes under alleged torture but were nevertheless later vindicated. Contrary to the circuit court's conclusion, we find defendant has produced sufficient evidence of a pattern on physical abuse by the detectives in question.

¶ 100                    C. Impact on Outcome of the Suppression Hearing

¶ 101   We now turn to the second relevant inquiry under *Whirl*, namely whether the outcome of the suppression hearing likely would have been different had the detectives been impeached with the new evidence of torture. We answer this question in the affirmative.

¶ 102   The circuit court identified several reasons why it believed the outcome of the suppression hearing would likely not have changed, many of which boil down to aspects of defendant's testimony being "refuted" in one way or another by the State's witnesses. However, many of the points on which defendant's testimony was contradicted by the State's witnesses did not go directly to his allegations of torture, and are therefore only marginally relevant to the ultimate issue of whether the new pattern and practice evidence would likely have changed the result of the suppression hearing. *Whirl*, 2015 IL App (1st) 111483, ¶ 84; see also *Galvan*, 2019 IL App (1st) 170150, ¶ 74 (circuit court's finding that defense witnesses lacked credibility was "not relevant to the issue of whether Detective Switski's credibility might have been impeached as a result of the new evidence that Detective Switski participated in systematic abuse"). Additionally, we find it difficult to image a scenario in which the detectives' testimony is not viewed in a new light given the numerous torture allegations made by other defendants, which was not available at the time of the original suppression hearing and has apparently yet to be specifically litigated on the merits in defendant's case. Further, to the extent the circuit court relied on ASA Lambur's credibility as being "essential" to the outcome of the suppression hearing, we note that her account gave little

insight into defendant's allegations of torture. To be sure, ASA Lambur contradicted defendant's testimony in several respects. However, she was not alleged to have witnessed the torture. Thus, ASA Lambur's testimony was extremely limited in its ability to "refute" the allegations relevant to this appeal. See *Gibson*, 2018 IL App (1st) 162177, ¶¶ 97-98 (testimony of an ASA and detectives who were not present for the alleged torture could not refute the defendant's claims of physical abuse).

¶ 103   What is important, however, is that defendant's allegations of torture have remained remarkably consistent since he first made them in the 1990s. *Wilson*, 2019 IL App (1st) 181486, ¶ 64 (reliability of the defendant's torture allegations was boosted where they "have remained substantially the same for more than 30 years"); see also *Gibson*, 2018 IL App (1st) 162177, ¶ 120 (the defendant's "core allegations have remained the same" despite some variation in other details). Indeed, both the circuit court and the State recognize that the consistency of defendant's allegations weighs in his favor.

¶ 104   Additionally, despite the State's arguments to the contrary, we find that defendant's allegations are strikingly similar to the other claims contained in his new evidence. *Patterson*, 192 Ill. 2d at 144-45 (new evidence of torture would likely change the result upon retrial where the defendant's allegations were consistent over time and "strikingly similar" to other claims of torture against the same officers); *Harris*, 2021 IL App (1st) 182172, ¶¶57-60 (outcome of the suppression hearing likely would have been different where the defendant "consistently alleged that his confessions were coerced, and his allegations of coercion [we]re comparable to the acts of coercion set forth in the new evidence"). For instance, defendant's new evidence contained numerous allegations that the same detectives identified by defendant slapped and hit others while they were handcuffed to a ring on the wall or other object. The new evidence also showed that multiple

defendants alleged that the detectives pulled their hair or their fingers back, which defendant has consistently alleged happened to him. Further, defendant's new evidence details at least four other individuals who, like defendant, have claimed the detectives threatened consequences against their significant others, children, or both. Because defendant's allegations of torture have been consistent and are strikingly similar to the allegations of others, we cannot say that defendant's new evidence would not likely change the result in a new suppression hearing.

¶ 105                                    D. Remedy

¶ 106   Having determined that the circuit court erred in denying defendant relief, we now turn to what remedy is appropriate. Defendant contends that we should suppress his statement outright without the need for a new suppression hearing because it is apparent that the State would be unable to prove his confession was voluntary on remand. The State counters by arguing that the only relief this court may enter is a new suppression hearing. However, the State cites to no relevant authority for this proposition.

¶ 107   We agree with defendant that outright suppression is a possible remedy under the Act. In *Wilson*, we examined the purpose and legislative history of the Act, concluding that the Act was "intended to definitively and expeditiously decide whether a petitioner was tortured and provide appropriate relief." *Wilson*, 2019 IL App (1st), ¶¶ 48-50. We stated that the Act authorized this court to award "a variety of remedies" in order to effectuate this purpose, including remedies beyond those allowed under the Post-Conviction Hearing Act. *Id.* ¶¶ 48, 52. We specifically identified that among this "variety of remedies" was the power to order the suppression of a confession. *Id.* ¶ 52.

¶ 108   However, although we have the authority to order outright suppression, we do not believe it is the appropriate remedy in this case. Generally, when faced with a motion to suppress a

statement, the State bears the initial burden of proving the statement was voluntary by a preponderance of the evidence. *People v. Richardson*, 234 Ill. 2d 233, 254 (2009). If the State makes this *prima facie* case, the burden shifts to the defendant to produce evidence that the statement was involuntary. *Id.* Finally, if the defendant satisfies his burden, the burden then reverts to the State to prove the statement was in fact voluntary. *Id.*

¶ 109   Because we have found that defendant has shown that new evidence would likely have resulted in suppression, the State will have the burden of proving the confession was voluntary. *Wilson*, 2019 IL App (1st) 181486, ¶ 53. However, we cannot go so far as defendant to conclude that the State could not carry its burden under any circumstances on remand. Although, as explained, defendant's credibility was of only "marginal relevance" to the central issue at the post-TIRC evidentiary hearing (*Whirl*, 2015 IL App (1st) 111483, ¶ 84), it becomes more important at new suppression hearing.

¶ 110   To be sure, the circuit court in this case identified several reasons to be skeptical of defendant's credibility that were not in and of themselves against the manifest weight of the evidence. For example, there was conflicting evidence as to the presence of O'Brien. Although defendant testified that O'Brien was present and participated in the torture, the State's witnesses testified that O'Brien was not there, which was apparently corroborated by a copy of O'Brien's timecard for the relevant days. Additionally, the State's witnesses gave accounts that were essentially consistent with each other and contradicted defendant in several respects. All three detectives strongly denied abusing defendant. Halloran and Boudreau both testified that they only interviewed defendant twice, including once where defendant admitted to the murders. This varied greatly from defendant's account that he refused to talk on numerous occasions despite repeated torture. As previously noted, the testimony of ASA Lambur also contradicted defendant's on

several points, including whether he initially denied involvement in the murders and whether Boudreau fed him details to include in the confession. Thus, although defendant's new evidence would likely have a significant impact on a suppression hearing, we do not agree with defendant that there is no scenario in which the State can prove the confession was voluntary. We will therefore not order outright suppression. However, because we believe defendant has produced sufficient impeachment evidence of torture, we find defendant is entitled to a new suppression hearing.

¶ 111   As a final matter, although we commend the circuit court's thorough analysis of the issues in this case, we find the interests of justice would be best served if the matter were assigned to a new judge on remand in light of the credibility determinations already made by the previous judge. See *Harris*, 2021 IL App (1st) 182172, ¶ 62 (reassigning on remand where the original judge "expressed a tendency to affirm the officers' credibility while giving little weight to [the] defendant's new evidence"); see also *People v. Serrano*, 2016 IL App (1st) 133493, ¶ 45 (this court has the authority to reassign a matter to a new judge on remand). Accordingly, we order that the case be reassigned to a new judge on remand.

¶ 112                                    III. CONCLUSION

¶ 113   For the reasons stated, we the judgment of the circuit court is reversed, and the matter remanded for a new suppression hearing, and if necessary, a new trial.

¶ 114   Reversed and remanded with directions.