2025 IL App (1st) 231740

No. 1-23-1740

First Division
September 29, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

|  |  |  |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | No. 92 CR 25596 |
| CLAYBORN SMITH, | ) ) | Honorable Carol M. Howard |
| Petitioner-Appellee. | ) | Judge, Presiding. |

_____

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Howse concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The circuit court's order is reversed and the matter remanded for a new evidentiary hearing on a TIRC referral where the court's order was based on a point of law directly contradicted by a subsequent supreme court decision.

¶ 2    As both parties recognized at oral argument, this appeal presents a unique and complex procedural scenario. The current legal saga began in October 1992, when petitioner Clayborn Smith was arrested in connection with an attack on his grandfather, great aunt, and great uncle.

Petitioner was convicted and sentenced to life in prison on two counts of first-degree murder, two counts of aggravated arson, and one count of aggravated battery arising from the incident. Part of the trial evidence used against petitioner was his court-reported confession given after interrogation at the Area 1 police station.

¶ 3    In 2011, petitioner filed a claim of torture with the Torture Inquiry and Relief Commission (TIRC) in which he alleged that he falsely confessed due to mental and physical abuse by former Chicago police detectives John Halloran, Kenneth Boudreau, and James O'Brien. TIRC referred defendant's claim for judicial review, and an evidentiary hearing was held in the circuit court before Judge Alfredo Maldonado in 2018. After an extensive hearing, Judge Maldonado issued a lengthy ruling denying defendant's claim, finding that although the allegations were "disconcerting, to say the least," there "simply was a failure of proof in this case."

¶ 4    This court reversed on appeal, finding that petitioner produced sufficient evidence to warrant a new suppression hearing before a different circuit court judge. *People v. Smith*, 2022 IL App (1st) 201256-U, ¶¶ 110-11. A new suppression hearing was held on remand, after which Judge Carol M. Howard ruled that defendant's statement be suppressed. The State now appeals, and for the following reasons, we reverse Judge Howard's order and remand the matter for a new evidentiary hearing on defendant's TIRC referral.

¶ 5                                    I. BACKGROUND

¶ 6    Many of the facts of this case are set forth in this court's 2022 order reversing the circuit court's denial of defendant's TIRC claim. *Id.* We recount these background facts and the events on remand to the extent necessary to resolve the issues presented on appeal.

¶ 7                        A. Defendant's Arrest, Confession, and Conviction

¶ 8     The bodies of Miller Tims, defendant's grandfather, and Ruby Bivens, defendant's great aunt, were discovered in their home on the evening of October 18, 1992. They had been beaten and the home set on fire. Herbet Tim's, defendant's mentally-disabled great uncle, was also beaten and burned but survived.

¶ 9     Petitioner was arrested for the attack on October 20, 1992. He was transported to Area 1, where he was interviewed by Detective Halloran, Detective Boudreau, and former Assistant State's Attorney (ASA) Laura Lambur. In the early morning hours of October 22, 1992, petitioner gave a court-reported confession in the presence of Detective Boudreau and ASA Lambur. Petitioner moved to suppress the statement at trial, which was denied. Following a trial in 1994, petitioner was convicted of first-degree murder, aggravated arson, and aggravated battery and sentenced to life in prison. On direct appeal, petitioner argued, *inter alia*, that the circuit court erred in denying his motion to suppress. *People v. Smith*, No. 1-94-2521 (1996) (unpublished order under Illinois Supreme Court Rule 23). This court rejected that argument and affirmed defendant's convictions. *Id.*

¶ 10                    B. TIRC Proceedings Before Judge Maldonado

¶ 11    After a series of unsuccessful postconviction filings, petitioner filed in 2011 a claim of torture with TIRC against Detectives Halloran, Boudreau, and O'Brien. TIRC referred the claim for judicial review and the matter proceeded to an evidentiary hearing before Judge Maldonado in 2018. After a lengthy hearing, Judge Maldonado issued a thorough 57-page order denying petitioner relief. First, Judge Maldonado applied the standard announced by this court in P*eople v. Whirl*, 2015 IL App (1st) 111483, ¶ 80, where this court found that the circuit court's role was not to decide whether the defendant's confession was actually coerced, but rather "whether the confession itself outcome of the suppression hearing likely would have differed if the officer who

denied harming the petitioner had been subject to impeachment based on evidence revealing a pattern of abusive tactics employed by the officer in the interrogation of other suspects." Applying this standard, Judge Maldonado found that the pattern and practice evidence against the detectives in this case, although "voluminous" was ultimately "lacking in depth." Judge Maldonado also identified several additional reasons why he believed the pattern and practice evidence would not likely have changed the result of defendant's original suppression hearing. For example, Judge Maldonado cited the facts that (1) petitioner did not allege abuse during an interaction with the same detectives during an unrelated case earlier in 1992, (2) other evidence "refuted" defendant's claims that the detectives took his shoes and pulled his braids out during the abuse, and (3) defendant's contention that Detective Boudreau fed him information during the court-reported statement was "highly improbable." Accordingly, Judge Maldonado denied petitioner any relief under the TIRC Act.

¶ 12                                    C. This Court's 2022 Order

¶ 13    Petitioner filed a timely notice of appeal, and on June 21, 2022, this court issued a Rule 23 order reversing Judge Maldonado's decision. *Smith*, 2022 IL App (1st) 201256-U, ¶ 113. Citing *People v. Wilson*, 2019 IL App (1st) 181486, ¶ 51, we stated that judicial review under the TIRC Act is "akin to a third-stage evidentiary hearing under the *Post-Conviction Hearing Act* (725 ILCS 5/122-1 et seq. (West 2010))." *Id.* ¶ 91. We agreed with Judge Maldonado that, under the applicable *Whirl* standard, the circuit court's purpose was not to decide whether defendant's confession was in fact coerced, but rather "whether the outcome of the original suppression hearing would likely have been different" if Detectives Halloran, Boudreau, and O'Brien's denials of wrongdoing would have been impeached with evidence that they engaged in a pattern of abuse in other cases. *Id.* ¶ 92.

¶ 14    After reviewing the abundant pattern and practice evidence produced by petitioner below, we disagreed with Judge Maldonado by finding that petitioner "produced sufficient evidence of a pattern of physical abuse by the detectives in questions." *Id.* For example, we noted, among other things, that defendant's evidence showed that at least eight defendants who alleged they were tortured into falsely confessing by Detectives Halloran, Boudreau, and/or O'Brien were later acquitted or exonerated in some way. *Id.* ¶ 100.

¶ 15    On the question of whether the pattern and practice evidence would have impacted the suppression hearing, we found it "difficult to imagine a scenario in which the detectives' testimony [was] not viewed in a new light given the numerous torture allegations made by other defendants." *Id.* We also noted that defendant's allegations had been "remarkably consistent" since the 1990s and were "strikingly similar" to the accounts of other defendants who alleged detectives hit them while they were handcuffed to a ring on the wall, pulled their hair and fingers, and threatened their significant others or children. *Id.* ¶ 104. Thus, we found that defendant's evidence would have been likely to affect the result of his suppression hearing. *Id.*

¶ 16    With respect to the appropriate remedy, we declined to order that defendant's statement be suppressed outright. *Id.* ¶ 106. We found outright suppression unwarranted where we could not say that there were no circumstances under which the State could still succeed on a motion to suppress on remand. *Id.* ¶ 109. In particular, we, like Judge Maldonado, stated that although defendant's credibility was of only " 'marginal relevance' " to the TIRC proceedings before the circuit court, it would be "more important at a new suppression hearing." *Id.* ¶ 110 (quoting *Whirl*, 2015 IL App (1st) 111483, ¶ 84). Consequently, we ordered that a new suppression hearing occur on remand at which "the State will have the burden of proving the confession was voluntary" under the familiar burden-shifting framework that typically applies to motions to suppress. *Id.* ¶ 109; see

also *People v. Richardson*, 234 Ill. 2d 233, 254 (2009) (describing burden-shifting process for a motion to suppress). Finally, we found, in light of the credibility determinations already made by Judge Maldonado, the interests of justice would best be served if the new suppression hearing was remanded to a different circuit court judge. *Id.* ¶ 111.

¶ 17                                D. Remand Proceedings

¶ 18    On remand, the matter was reassigned to Judge Carol M. Howard. Prior to hearing the new motion to suppress, Judge Howard granted defendant's motion for collateral estoppel, ruling that Detectives Halloran and Boudreau had "engaged in a pattern and practice of abusive conduct" in similar cases from 1990 to 2001.

¶ 19                                1. Defendant's Testimony

¶ 20    At the suppression hearing, petitioner testified that he was arrested at the Robert Taylor Homes on October 20, 1992, and transported to Area 1. On the way, there was "a lot of yelling" with the detectives in the car accusing him of the murders. When petitioner denied the allegations, one unknown detective "smacked [him] in the mouth." The second time he proclaimed his innocence, Detective Halloran hit him on the other side of his head.

¶ 21    Upon arrival at Area 1, petitioner was taken to an interview room and handcuffed to a metal ring attached to the wall. Eventually, Detectives Halloran and Michael Clancy entered the room and told petitioner that "they had Karen" and that he should make a statement "if [he] wanted to make things light on [them] all." "Karen" referred to defendant's then-girlfriend, 18-year-old Karen Tate-Beckman, who was six months pregnant with defendant's unborn baby at the time. When petitioner replied that he had no knowledge of the crimes, the detectives yelled at him and Detective Clancy "slapped [him] across the head" and kicked him "across the feet."

¶ 22    At some point, Detective Boudreau interrupted and asked to speak with petitioner alone. Detective Boudreau told petitioner that Tate-Beckman was at the police station crying and that petitioner should tell them what happened "if [he] didn't want to see her go to jail and lose the baby."

¶ 23    Detectives Halloran and Clancy re-entered the interview room, and Detective Halloran grabbed petitioner by the collar with both hands and forced him to the ground. While Detective Halloran held petitioner on the ground, Detective Clancy punched him and yelled at him. Detective Halloran claimed witnesses had placed petitioner at the crime scene and that "Karen [would] go to jail when she spit [sic] the baby out." However, the detectives left after petitioner maintained that he did not know anything.

¶ 24    Later, Detectives Halloran and Boudreau returned and continued to question defendant. At some point during this interrogation, Detective Halloran grabbed defendant's head and slammed it against the wall. Detective Boudreau took defendant's socks and shoes and then left. When Detective Boudreau returned, he stated that he knew the crime was just a "spur of the moment incident" and that he could "help" petitioner if he made a statement. Detective Boudreau continued that Tate-Beckman was there crying and being interrogated by Detective Halloran. Detective Boudreau stated that Karen would "go to jail [and] will lose the baby" if petitioner did not tell them about the murders.

¶ 25    Detective Halloran came in and questioned petitioner about Tate-Beckman's involvement in the crimes. When petitioner refused to respond, Detective Halloran "started pounding [him] on the top of the head." Detective Halloran then grabbed petitioner by the braids in his hair and tried to punch defendant's head while petitioner attempted to block his punches. Detective Boudreau

stated that petitioner did not "want to see [his] child grow up in a foster home," and that he could help himself by claiming that he acted in self-defense or in the heat of the moment.

¶ 26 Later, ASA Steven Rosenblum entered the room, introduced himself to defendant, and read petitioner his *Miranda* rights. Petitioner told ASA Rosenblum that he wanted a lawyer because he was "t[ir]ed of getting hit, hollered at and kicked." ASA Rosenblum left and Detective Halloran returned, stating that petitioner was "f***ing stupid" if he thought they would honor his request for a lawyer. Detective Halloran then stated, "we got you, we got your bitch" and started punching petitioner again before leaving.

¶ 27 ASA Rosenblum returned sometime later and told petitioner that he would be charged with murder and that "it was on [him] whether Karen was charged" as well. ASA Rosenblum then left after a brief conversation, and petitioner never saw him again.

¶ 28 Next, Detectives Halloran and Boudreau returned and got within inches of defendant's face, "spitting in [his] face" and ear as they yelled at him. Petitioner told them to "get out of [his] face," at which point Detective Halloran pulled defendant's braids and told him that he would not let go until he talked. Petitioner responded by repeatedly saying that he wanted a lawyer. Detective Halloran let go of defendant's hair and left the room. Detective Boudreau stayed behind, suggesting that petitioner should talk to him alone without that "crazy bastard" Detective Halloran. However, petitioner still refused to make a statement, so Detective Boudreau left the room.

¶ 29 Detective Boudreau returned sometime later and showed petitioner a pink piece of paper that he claimed proved that the victims' blood was found on defendant's shoes. Detective Boudreau left the document with petitioner and left to "give [him] a minute to think about it." When Detectives Boudreau and Halloran returned, they told petitioner that he could either tell

them what happened and go home or be booked. Petitioner did not respond, so Detective Halloran uncuffed him from the ring on the wall and took him to the lockup for booking.

¶ 30    Next, petitioner was escorted from the lockup to a room where he participated in a line up. On the way to the lineup room on the second floor, petitioner briefly saw Tate-Beckman standing next to Detective Boudreau. After the lineup, Detectives Boudreau and Halloran took petitioner to a room and told him that he was going to be charged because he had "been identified" by someone. Petitioner responded, "why don't you get me a lawyer." The detectives then left without further conversation.

¶ 31    Eventually, petitioner was brought back to the lockup. Detective Boudreau next came to the lockup and told petitioner that the lawyer he requested was upstairs waiting for him. Petitioner went upstairs with Detective Boudreau, where he was handcuffed to a chair in an interview room. There, petitioner met ASA Lambur, who explained that she was a prosecutor and not his lawyer. Petitioner became "a little agitated" that he did not have the lawyer he was promised, so Detective Boudreau grabbed him and his chair and slid petitioner into a different room. Detective Boudreau told petitioner not to "disrespect" ASA Lambur and that he would receive the death penalty "if [he] didn't try to explain [him]self." Detective Boudreau then took petitioner to another room where he could see two of his friends talking to ASA Lambur from behind a two-way mirror. Detective Boudreau claimed that they were incriminating petitioner and that "it would be best if [he] explain[ed]" his side of the story. When petitioner still refused to make a statement, he was brought back to an interview room and handcuffed to the wall once again.

¶ 32    Later, Detective Boudreau returned with photographs of the crime scene and encouraged petitioner to make a statement because the police had evidence against him. Because petitioner

refused to look at the photographs, Detective Boudreau "shove[d] them in his face" before leaving petitioner alone to "think about it."

¶ 33    When Detective Boudreau returned shortly thereafter, he stated that he "wasn't going to try to help [defendant]" anymore, and that ASA Lambur was going to come in and take his statement. ASA Lambur read petitioner his *Miranda* rights and asked him to explain his whereabouts on the day of the offense. Petitioner told her that he was home all day with Tate-Beckman except for a brief trip to the store. ASA Lambur took notes on what he said and left the room when they were done.

¶ 34    Next, in the late evening hours on October 21, Detective Halloran came in the room and stated that he knew petitioner lied to ASA Lambur because Tate-Beckman did not corroborate his alibi. Detective Halloran then grabbed petitioner and tried to force him to the ground in the same way as he did before. As Detective Halloran did so, petitioner "pushed his leg," which prompted Detective O'Brien to enter the room and punch petitioner and pull the fingers back on his right hand. Detective Halloran also pulled defendant's fingers back on his left while yelling at petitioner to "tell [them] what happened." The detectives told petitioner that they would bring ASA Lambur back in and were "not going to play games" with him anymore. Petitioner testified that this was the first time he had seen Detective O'Brien.

¶ 35    When ASA Lambur returned, petitioner told her that he did not want to talk to her. Detectives Halloran and O'Brien asked ASA Lambur to step out of the room, at which point "[t]hey came in and did the exact same thing they had did before." The detectives then brought ASA Lambur back into the room and she took defendant's court-reported statement in the presence of all three detectives. Petitioner testified that Detective Boudreau was "feeding [him] information" by making frequent comments and suggesting answers to petitioner based on the

photographs that he had previously shown him. Petitioner also supplied other false information based on some of the crime scene evidence that Detective Boudreau had previously told him.

¶ 36    Afterwards, petitioner was presented with a typewritten transcript of his statement. ASA Lambur made some corrections to the statement and asked petitioner to initial next to the changes to "acknowledge the fact that she did that." Petitioner initially refused to sign the statement, but later agreed to do so because Detective Boudreau told him that he had to sign it if he "wanted to use it as self defense in order for them to help [him] get the charges reduced."

¶ 37    Petitioner was later taken to bond court, where he told his appointed lawyer that the detectives had "been beating and punching on [him] for two days." He also showed her where the detectives had pulled out the braids in his hair. The lawyer took notes on what he told her and said she would talk to him later but never returned. Petitioner was later pulled out of line at bond court and photographed. The photographs, which were admitted into evidence, show some of defendant's braids were undone.

¶ 38                              2. Karen Tate-Beckman's Testimony

¶ 39    Tate-Beckman testified that she was at home with petitioner when some of his friends knocked on their door and told them that defendant's grandfather and great aunt had been found dead and that petitioner was being accused of their murders. Petitioner and Tate-Beckman left their home and went to her cousin's house because they were "young" and "fearful" and did not know what else to do. After news of the murders became public, Tate-Beckman called her father to check in. Her father told her to come to his house and that they would call the police once she arrived. Detectives Boudreau and Halloran picked Tate-Beckman up at her father's home and drove her to Area 1. She was locked in an interview room, where "different police officers came in randomly to question [her]." Detectives Boudreau and Halloran interviewed her multiple times because "they

didn't like [her] answer" that she was at home with petitioner and did not know anything about the murders. Eventually, the detectives became "angry" and threatened to "charge [her] with this crime and *** take her child and [she] would never see [her] child" if she did not tell them what they wanted to hear. Tate-Beckman "just kept making up stories" because she wanted to keep her unborn baby and did not know what else to do. She falsely incriminated petitioner to the detectives, ASA Lambur, and the Grand Jury because of the detectives' threats. Tate-Beckman was held at Area 1 for three days, during which time she was provided only one meal despite being six months pregnant.

¶ 40    At some point, Tate-Beckman saw petitioner being escorted by detectives through Area 1. She testified that petitioner "looked like a wild man" because "his hair was pulled out like somebody had pulled his hair." Tate-Beckman did not tell ASA Lambur that the detectives had threatened her because they told her not to and she was afraid that they would charge her with murder and take her baby if she did.

¶ 41                                3. Detective Halloran's Testimony

¶ 42    For the State, Detective Halloran testified that he, Detective Boudreau, and Detective O'Brien were transferred to Area 1 from Area 3 when Area 3 was shut down around October 15, 1992. In the early morning hours of October 19, 1992, Detectives Halloran and Boudreau drove to defendant's last known address and discovered that his room was vacant. Based on information they found at defendant's residence, they contacted Tate-Beckman's father, Virgil Tate. The detectives met Tate at a coffee shop and informed him that they were looking for petitioner in connection with a double murder. Petitioner was eventually located and arrested around 9 a.m. on October 20. Detectives Halloran and Boudreau were in the car that drove petitioner to Area 1, but

they did not ask him any questions or strike him during the short ride. At Area 1, the detectives placed petitioner in a second-floor interview room and removed his handcuffs.

¶ 43    Detectives Halloran and Boudreau first interviewed petitioner around 10 a.m. on October 20. Petitioner denied involvement in the murders and claimed that he was at home with Tate-Beckman when the murders occurred. The detectives confiscated defendant's shoes because they noticed "what could possibly be blood smudged" on them and left after about 15 or 20 minutes. Petitioner was taken to the lockup around 8:30 a.m. on October 21. Detectives did not attempt to interview petitioner again before his first trip to the lockup because they were busy interviewing other witnesses who were more willing to talk to them. Detectives Halloran and Boudreau signed petitioner out of the lockup and interviewed him for the second time around 8 p.m. on October 21. Detective Halloran read petitioner his *Miranda* rights and informed him of the evidence they had gathered since their first interview. Petitioner was "forthcoming" and confessed to the murders during the approximately hour-long interview. Afterwards, ASA Lambur and Detective Boudreau interviewed petitioner again and then later took a court-reported statement for which Detective Halloran was not present.

¶ 44    Detective Halloran further testified that there was never any "swearing or antagonism on either side" during his interactions with defendant. Detective Halloran denied physically abusing petitioner or telling him that Tate-Beckman could be charged and lose her baby if he did not make a statement. No other detective hit petitioner or threatened Tate-Beckman in Detective Halloran's presence. In fact, Detective Halloran testified that he never hit or threatened anyone during an interview in his career, nor did he ever see another detective hit or threaten anyone during an interview.

¶ 45    Detective Halloran also testified that petitioner was "manipulating his hair" with his hands during his time in custody and was "pulling the braids out" during the interviews. Petitioner was never handcuffed to the wall while in Detective Halloran's presence. Detective Halloran did not see Detective O'Brien at Area 1 in the days following defendant's arrest.

¶ 46    Regarding Tate-Beckman, Detective Halloran testified that she was waiting for him at Area 1 when he arrived for work in the early morning hours of October 20, 1992. Tate-Bechman was several months pregnant and clearly "showing." Detectives Halloran and Boudreau "had a "very long and detailed conversation" with Tate-Beckman, during which she stated that she saw petitioner cleaning his shoes with spit and that his feet were "blood soaked." After this conversation, Tate-Beckman was moved to an interview room. She remained at Area 1 until after her Grand Jury testimony sometime on October 21.

¶ 47                          4. Detective Boudreau's Testimony

¶ 48    Detective Boudreau testified that he was part of the team that arrested petitioner on October 20, 1992 and transported him to Area 1. Nobody questioned, threatened, or hit petitioner on the way to Area 1. Once at Area 1, petitioner was placed in an interview room and had his handcuffs removed. A short time later, Detective Halloran and Boudreau interviewed petitioner after reading him his *Miranda* rights. During an approximately 20-minute long conversation, petitioner claimed that he was at home with Tate-Beckman at the time of the murders and did not know anything about the crimes.

¶ 49    The next evening, Detectives Boudreau and Halloran retrieved petitioner from the lockup and brought him back to an interview room on the second floor. Petitioner was re-read his *Miranda* rights and presented with the evidence that the detectives had gathered. Petitioner then confessed to the murders. Detective Boudreau notified ASA Lambur of defendant's confession, and

Detective Boudreau and ASA Lambur then interviewed petitioner again. ASA Lambur read petitioner his *Miranda* rights and advised him that she was a prosecutor, not his attorney. Petitioner agreed to speak to them and gave a substantially similar confession as before. ASA Lambur then arranged to have a court reporter come to Area 1 for the purpose of memorializing defendant's statement.

¶ 50    Just after midnight leading into October 22, 1992, petitioner confessed to the murders in a court-reported statement. Afterwards, Detective Boudreau, petitioner, and ASA Lambur signed each page of the typewritten statement. Detective Boudreau denied interrupting ASA Lambur or making any comments not reflected in the transcript of the statement.

¶ 51    Detective Boudreau also denied that he or anyone else hit petitioner or pulled his hair in any way. Neither Detective Boudreau nor anyone in his presence told petitioner that he could avoid murder charges or the death penalty if he made a statement. Detective Boudreau did not hear anybody tell petitioner that Tate-Beckman would be charged with murder unless he made a statement. Petitioner did not tell ASA Lambur that he did not want to speak to her, and Detective Boudreau did not pull petitioner out of the room in the presence of ASA Lambur.

¶ 52                         5. Detective O'Brien's Testimony

¶ 53    Detective O'Brien testified that he was not at Area 1 on October 20 and 21 of 1992 because he was attending a computer training at the Chicago Police Training Academy. Detective O'Brien identified a copy of his timecard for October 1992, which bears the notation "IST" for October 20 and 21. Detective O'Brien testified that "IST" meant he was at in-service training on those days. He participating in the investigation of defendant's case. Detective O'Brien acknowledged that petitioner had previously filed a complaint against him with the Office of Professional Standards, which was deemed "unfounded."

¶ 54                    6. ASA Lambur's Testimony

¶ 55    ASA Lambur testified that she reported to Area 1 shortly after 6 p.m. on October 20, 1992 as part of her duties with the Felony Review Unit. After speaking to detectives and other witnesses, she first interviewed petitioner around 10 p.m. in the presence of Detective Boudreau. Petitioner was read his Miranda rights and then confessed to the murders.

¶ 56    ASA Lambur then explained to petitioner that he could leave his statement as an oral statement or choose to put it in writing. Petitioner opted to memorialize his confession in a court-reported statement. ASA Lambur summoned court reporter Timothy Bennett to Area 1 in order to take defendant's statement. While they waited for Bennett to arrive, petitioner told ASA Lambur that the police were treating him well.

¶ 57    Just after midnight on October 22, 1992, petitioner gave a court-reported statement in the presence of ASA Lambur, Detective Boudreau, and Bennett. Petitioner signed the statement and also initialed where minor changes were made to the typewritten text.

¶ 58    ASA Lambur further testified that defendant, who wore his hair in braids at the time, "touched his hair often" and frequently put his head in his hands during her interviews with him. ASA Lambur did not see detectives hit or yell at defendant. Petitioner did not tell her that he was being mistreated while in custody. ASA Lambur did not see Detective O'Brien at Area 1 on October 21.

¶ 59                    7. Timothy Bennett's Testimony

¶ 60    Bennett testified that he was the court reporter who memorialized defendant's court-reported statement. Bennett identified the statement in court, which showed that it was taken from 12:01 a.m. to 12:28 a.m. on October 21, 1992. The statement also reflects that only Bennett, defendant, ASA Lambur, and Detective Boudreau were present for the statement. Bennett stated

that nobody entered the room or spoke during the statement other than those who were reflected in the transcript.

¶ 61                              8. Shannon Lang's Testimony

¶ 62    Shannon Lang testified that he was working as the "detention aide" or booking officer in the  Area 1 lockup around the time of defendant's arrest. Lang identified a "lockup keeper report" from October 1992 that was signed by his partner, the now-deceased Ricky Aldridge. The report reflects that petitioner was brought to the lockup at 8:35 a.m. on October 21, 1992. No complaints or injuries were noted on the report. Petitioner was later signed out for a lineup by a Detective Moran at 12:15 p.m., and then returned to the lockup at 2:45 p.m. Petitioner was next signed out for another lineup by a Detective Foley at 8 p.m. and never returned to the lockup.

¶ 63                              9. Judge Howard's Ruling

¶ 64    On September 5, 2023, after hearing arguments from the parties, the circuit court granted defendant's motion to suppress his statement. In so ruling, the court stated that "the detectives did engage in coercive conduct regarding the taking of Clayborn Smith's statement." Specifically, the court opined that "[t]he major act of coercion that the Court finds resulted in the involuntary statement is the detectives' threats to charge Ms. Karen Tate-Beckham [*sic*] if Mr. Clayborn Smith did not give a statement." The court explained that it found Tate-Beckman to be a "credible witness, despite some inconsistencies in her testimony." The court continued that ASAs Lambur and Rosenblum were also "credible," but noted that they were not claimed to be present during the alleged abuse. Finally, the court found that the detectives' testimony was "undermined" by the pattern and practice evidence. Based on its finding that defendant's statement was coerced, the court ordered that defendant's statement be suppressed during a new trial.

¶ 65    This appeal followed.

¶ 66                                    II. ANALYSIS

¶ 67     On appeal, the State concedes that Judge Maldonado, Judge Howard, and this court's 2022 order applied the correct legal standards as they existed at the time of those respective rulings. However, the State contends that our supreme court's decision in *People v. Fair*, 2024 IL 128373, which was issued over 5 months after Judge Howard's ruling, clarified that TIRC Act requires a petitioner to prove he was tortured by a preponderance of the evidence.

¶ 68                                    A. *People v. Fair*

¶ 69     In *Fair*, the petitioner was convicted of one count of first-degree murder by accountability based in part on a handwritten confession taken by ASA Adrian Mebane. *Id.* ¶ 14. Several years later, the petitioner filed a claim of torture with TIRC, alleging that a detective kicked him in the leg and threatened to shoot him while resting his hand on his service weapon. *Id.* ¶ 20. The petitioner further alleged that he was kept awake, handcuffed to a metal ring on the wall, denied access to a lawyer, and deprived of his asthma medication and food during the approximately 30 hours he was in custody. *Id.*

¶ 70     TIRC referred the matter for judicial review, and an evidentiary hearing was held in the circuit court. *Id.* 29. The circuit court denied the petitioner relief, finding that he failed to provide sufficient evidence of torture. *Id.* ¶ 45. In particular, the court noted that the petitioner's account had changed over time, including on the nature of the alleged abuse and whether a gun was involved. *Id.* On the other hand, the court found ASA Mebane, who rebutted several of the petitioner's allegations, to be an " 'extremely' credible witness." *Id.* ¶ 46.

¶ 71     This court affirmed on direct appeal, albeit on the alternative basis that the State met its burden of showing that the petitioner's statements were voluntary and not the product of torture. *Id.* ¶ 50.

¶ 72    On appeal to our supreme court, the parties disagreed on the burdens of proof and production in an evidentiary hearing following a TIRC referral. *Id.* ¶ 58. The petitioner argued that, in accordance with cases like *Wilson*, 2019 IL App (1st) 111483, ¶ 80, such a hearing should be treated identically to a third-stage evidentiary hearing under the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2018)). *Fair*, 2024 IL 128373, ¶ 58. The State, on the other hand, contended that the TIRC Act requires the circuit court to determine whether the petitioner had proved that torture occurred by a preponderance of the evidence. *Id.* ¶ 59.

¶ 73    Our supreme court agreed with the State, concluding that the plain language of the TIRC Act "requires the circuit court to determine whether a petitioner has shown by a preponderance of the evidence that (1) torture occurred and (2) resulted in a confession that was (3) used to obtain a conviction, not access the voluntariness of statements or other constitutional claims that can be raised in a postconviction petition." *Id.* ¶ 79. Thus, the court overruled *Wilson* and other cases that adopted a contrary standard that did not require the circuit court to determine whether torture occurred. *Id.*

¶ 74    The court went on to find that the TIRC Act requires a court considering whether torture occurred to consider the "totality of the circumstances, including any alleged violations that would not necessarily qualify as torture if viewed alone." *Id.* ¶ 88. Although the court emphasized that police misconduct must be "sufficiently extreme" to constitute torture under the TIRC Act, the court stated that a petitioner can satisfy his burden of proving that torture occurred "by a combination of different kinds of acts and omissions—including alleged mental as well as physical abuse—that cumulatively constitutes torture." *Id.* ¶ 88.

¶ 75                                    B. Law of the Case

¶ 76    Turning back to the present case, the State argues that *Fair* constitutes a change in Illinois law that requires this court to now reverse Judge Howard's ruling and "reinstate Judge Maldonado's denial of relief under the TIRC Act and the dismissal of the referral." Alternatively, the State asks us to remand the matter for a new TIRC referral hearing.

¶ 77    In response, petitioner argues that this court lacks jurisdiction to revisit our 2022 order because the time for appeal has long passed. The State counters that our supreme court's construction of the TIRC Act in *Fair* qualifies as an exception to the law of the case doctrine that applies where our supreme court makes a contrary ruling on the precise issue of law on which the appellate court had based its prior decision.

¶ 78    The law of the case doctrine "bars relitigation of an issue already decided in the same case." *People v. Tenner*, 206 Ill. 2d 381, 395 (2002). Thus, an issue of law decided on a previous appeal is binding on both the circuit court on remand and on the appellate court in a subsequent appeal. *People v. McDonald*, 366 Ill. App. 3d 243, 247. The doctrine's purpose is to "protect settled expectations of the parties, ensure uniformity of decisions, maintain consistency during the course of a single case, effectuate proper administration of justice, and bring the litigation to an end." *Id.* at 247.

¶ 79    However, one recognized exception to the law of the case applies where "the supreme court makes a contrary ruling on the precise issue of law which the appellate court had based its prior decision." *People v. Cole*, 2016 IL App (1st) 141664, ¶ 29. According to the State, that exception applies here because *Fair* contradicted the standard employed in this court's 2022 order reversing Judge Maldonado.

¶ 80    We agree with the State. This court's 2022 order explicitly employed the exact construction of the TIRC Act rejected in *Fair*. For example, we stated that "the circuit court's purpose in

- 20 -

considering a TIRC referral is not to determine the ultimate issue of whether the defendant's confession was coerced." *Smith*, 2022 IL App (1st) 201256-U, ¶ 92. Instead, we continued, "the question [before the circuit court] is whether the outcome of the original suppression hearing would likely have been different if the officers who denied torturing the defendant had been subject to impeachment" based newly-discovered pattern and practice evidence. *Id.* This is directly contradictory to *Fair*, which unambiguously requires a petitioner to prove by a preponderance of the evidence that his confession was the result of actual torture. *Fair*, 2024 IL 12873, ¶ 79.

¶ 81    Petitioner argues that, regardless of the legal standard employed in this court's 2022 order, Judge Howard's decision should be affirmed because she essentially complied with *Fair* and concluded that his confession was the product of torture. However, as petitioner himself points out in his brief, the record is clear that both parties and Judge Howard conceived of the proceedings as a motion to suppress, not as an evidentiary hearing pursuant to a TIRC referral. We also note that our 2022 order remanded the matter for "a new suppression hearing," not a new TIRC referral hearing. Thus, we cannot say that the proceedings on remand complied with *Fair*.

¶ 82    We likewise reject petitioner's argument that, once this court issued its 2022 order, "[t]he TIRC case *** was over" and could not be revisited. The only support petitioner offers for this position is *People v. Harris*, 2023 IL App (1st) 221033, which has since been overturned by our supreme court.[1] See *People v. Harris*, 2025 IL 130351.

¶ 83    There, the defendant filed a motion to suppress his statements, alleging that he gave involuntary confessions in three cases as a result of physical and mental coercion. *Id.* ¶ 4. The trial found that the confessions were voluntarily made, and defendant was convicted of various offenses

---

[1] On August 19, 2025, we allowed the State's motion to cite our supreme court's decision in *Harris* as additional authority.

in all three cases. *Id.* After the convictions were affirmed on direct appeal, the defendant filed postconviction petitions under the Post-Conviction Hearing Act in all three cases. *Id.* ¶ 7. The petitions advanced to a third-stage evidentiary hearing, after which the circuit court denied postconviction relief. *Id.* ¶ 11.

¶ 84 The defendant appealed the denial of postconviction relief, arguing, *inter alia*, that the circuit court applied the incorrect burden of proof in evaluating his claims. *Id.* ¶ 12. This court reversed and remanded for a new suppression hearing, finding that the outcome of the suppression hearing likely would have been different if the detective in question were impeached with the defendant's newly-discovered pattern and practice evidence. *Id.* ¶ 17

¶ 85 On remand, the circuit court conducted a new suppression hearing before a different circuit court judge. *Id.* ¶ 18. Despite finding that the defendant's were not in fact coerced, the new judge nevertheless vacated the defendant's convictions and ordered a new trial based on the " 'possibility' " that evidence of the detective's misconduct " 'may result in a different outcome' " at a new trial. *Id*. ¶ 20.

¶ 86 The State appealed that order, but a divided appellate court panel dismissed the appeal for lack of jurisdiction. *Id.* ¶ 22. Specifically, the panel found that, in ordering a new suppression hearing, the first appellate decision had " 'implicitly' " vacated the convictions and envisioned a new trial regardless of the outcome of the new suppression hearing. *Id.* ¶ 22.

¶ 87 On appeal, our supreme court rejected the notion that the circuit court proceedings on remand were "not a continuation of the postconviction proceedings." *Id.* ¶ 46. Rather, the supreme court explained that "[t]he proceedings on remand were a continuation of the postconviction proceedings, which resulted in a final order from which the State could appeal." *Id.* ¶ 54.

¶ 88    Analogizing the logic of *Harris* to this case shows that, rather than some separate type of proceeding as petitioner suggest, the remand proceedings before Judge Howard were merely a continuation of the TIRC referral proceedings that began before Judge Maldonado and progressed to our 2022 order. Thus, the supreme court's decision in *Harris* refutes petitioner's argument that we lack jurisdiction to disturb our 2022 order.

¶ 89                    C. Voluntariness of Defendant's Statement

¶ 90    Because we have concluded that Judge Howard's order must be reversed in light of *Fair*, we need not address the State's alternative argument that she failed to consider the totality of the circumstances in evaluating whether petitioner's confession was voluntary.

¶ 91                    D. Remedy

¶ 92    Having concluded that our supreme court's decision in *Fair* requires reversal of Judge Howard's order, we now address the proper remedy on remand. First, the State requests that we "reinstate Judge Maldonado's denial of relief under the TIRC Act and the dismissal of the referral." However, we fail to see why we should "reinstate" Judge Maldonado's order when it is based on the exact same now-erroneous standard as our 2022 order. Alternatively, the State asks us to remand the matter for a new TIRC referral hearing to be governed by the standard announced in *Fair*. Petitioner, of course, expresses no opinion on the proper remedy in the event of remand and only contends we should affirm Judge Howard's order.

¶ 93    We find that the only appropriate remedy is to remand to the circuit court for a new TIRC referral hearing under the *Fair* standard. We reiterate that, pursuant to *Fair*, the circuit court must decide whether petitioner has shown by the preponderance of the evidence that (1) torture occurred, (2) that torture resulted in his confession, and (3) that confession was used to obtain his conviction. See *Fair*, 2024 IL 12873, ¶ 79.

¶ 94    The question remains, however, as to which judge the remand proceedings should be assigned. We note that the first remand proceedings were presumably reassigned to Judge Howard because our 2022 order found that, despite his thorough analysis of the case, "the interests of justice would best be served if the matter were assigned to a new judge on remand." *Smith*, 2022 IL App (1st) 201256-U, ¶ 111. In so finding, we cited *People v. Harris*, 2021 IL App (1st) 182172, ¶ 62 and *People v. Serrano*, 2016 IL App (1st) 133493, ¶ 45 as cases where different appellate court panels ordered remand proceedings "in the interests of justice."

¶ 95    In its brief on appeal, the State initially requested that we invoke this same principle to assign any remand proceedings to a judge other than Judge Howard. However, on August 28, 2025, our supreme issued *People v. Class*, 2025 IL 129695, ¶ 37, where the court held that the appellate court may *sua sponte* order judicial reassignment in postconviction cases only in "rare circumstances" in which the record "clearly reveals bias, the probability of bias, or prejudice on the part of the trial judge." Class also explicitly overruled *Serrano*, one of the cases on which our 2022 order relied. Class, 2025 IL 129695, ¶ 52.

¶ 96    On September 2, 2025, the State filed a motion to cite *Class* as additional authority, which we allowed. In the motion, the State withdrew its argument that we should order the matter be reassigned. The State further contended that the "higher court" exception to the law of the case doctrine should also apply to the portion of our 2022 order that reassigned the case on remand. Thus, the State asserts that the matter should be returned to Judge Maldonado.

¶ 97    We disagree with the State's interpretation of *Class*. The exception to the law of the case doctrine applies only where a higher court "makes a contrary ruling on the *precise issue of law* on which the appellate court had based its prior decision." (Emphasis added.) *People v. Cole*, 2016 IL App (1st) 141664. *Class* involved a proceeding under the Post-Conviction Hearing Act, and the

court based its holding in part on the specific nature of that statute. *Class*, 2025 IL 129695, ¶¶ 32-33 (noting that a postconviction petitioner "is not entitled to the full panoply of constitutional rights that accompany an initial criminal prosecution"). Although the TIRC Act and the Post-Conviction Hearing Act are somewhat analogous, they are not identical. Thus, the exception to the law of the case doctrine does not apply because *Class* does not involve the "precise issue of law" as the present case. Accordingly, we find that the matter should remain before Judge Howard.

¶ 98                                    III. CONCLUSION

¶ 99     For the reasons stated, we reverse the order of the circuit court and remand the matter for a new TIRC referral hearing before Judge Howard in accordance with the standard set by our supreme court in *Fair*.

¶ 100   Reversed and remanded.